## WALDEN *v.* STATE.

[92 South. 820, No. 22135.]

CRIMINAL LAW. *Refusal of change of venue not error, where record shows fair and impartial trial.*

Where the entire record in a murder case, viewed from its conclusion and as an entirety, shows that the defendant had a fair and impartial trial free from bias and prejudice, it was not error to overrule a motion for a change of venue.

APPEAL from circuit court of Holmes county.

HON. S. F. DAVIS, Judge.

Fannie Walden was convicted of murder, and she appeals. Affirmed.

See, also, 90 So. 177, 127 Miss. 486.

*Barbour & Henry* and *Boothe & Pepper,* for appellant.

*F. H. Lotterhos,* assistant attorney-general, for the state.

SYKES, P. J., delivered the opinion of the court.

The appellant was indicted and convicted of murder, and the jury failed to agree as to the punishment; consequently she was by the court sentenced to the penitentiary for life. From which judgment this appeal is prosecuted.

The appellant is a negro woman. On May 12, 1921, she killed a white man by the name of W. E. Moore at his home in the country near Lexington. The killing was done with Moore's revolver. There were two fatal wounds inflicted upon the deceased, one in the face and one in the breast. The killing occurred in the afternoon. The uncontradicted testimony shows that the appellant had been living with Moore as his mistress for about two years previous to the killing. One night about a week before the killing the testimony shows that they had a fuss. A state witness testi-

fied that the fuss occurred because the appellant wanted the deceased to pay some bills for her. The appellant testified that the cause of the fuss was about her wishing to sever relations with him and go to Hot Springs and marry a negro there; that she was in receipt of a letter from this negro, in which the negro had inclosed to her a letter written to him by the deceased. The morning following this fuss the appellant went to the home of her mother. Her testimony is to the effect that she received one or more letters from the deceased after leaving him, and also saw him in Lexington once or twice, and saw him at the home of her mother the night before the killing, and that deceased was insisting upon her returning to his home; that the deceased furthermore had told her he was going to California, and wanted to take her there with him; that he told her he would not permit her to go to Hot Springs and marry the negro, but would kill her first; that she promised him to return to his home; that it was not her intention to live with him again, but that she left him under the impression that she expected to do so, but that her real intention was to go to his home and get the balance of her personal belongings and go to Hot Springs; that she attempted to telephone the deceased from Lexington that she was on her way out there, but failed to get him on the phone. When she arrived at his house she there found a negro boy and girl. She testified that she told the boy to tell the deceased that she was there and wanted to see him. At this time the deceased was near the barn at work on a plow, a short distance from the house. Appellant testified that she did not go into the house. The negro girl testified that appellant went into the room twice before Mr. Moore came to the house. This was the room previously occupied by the appellant and the deceased. The testimony shows that Mr. Moore kept his pistol in this room usually lying upon the chifforobe; the appellant herself admits that she knew where Mr. Moore usually kept his pistol. The negro girl testified that upon the second visit of the appellant to this room she (the witness) through a window saw the appel-

lant pick up a pearl-handled pistol which belonged to Mr. Moore. This witness also testified to certain threats made by the appellant against her (the witness), which threats were denied by the appellant. The appellant denied going into the room, or any part of the house, before the arrival of Mr. Moore. The deceased was killed with his pistol, which, however, was not a pearl-handled pistol, but a black-handled pistol. There is no testimony other than that of this witness that Mr. Moore had a pearl-handled pistol; in fact from the record we are satisfied that he owned no pearl-handled pistol, but the black-handled pistol with which he was killed. Consequently the testimony of this witness that she saw the appellant pick up a pearl-handled pistol is bound to be untrue. It is possible, of course, that she saw the witness pick up the black-handled pistol. We think, however, that the jury had a right from this testimony to believe at least that the appellant went into this room where the black-handled pistol with which Mr. Moore was killed was kept, and from the other circumstances and facts testified to in the case to believe that on one of these trips she armed herself with this pistol.

According to the testimony of the appellant the deceased had stated to her that he would not permit her to leave him and go to Hot Springs to marry this negro; that he would kill her before allowing her to do so; that he told her she could only go there over his dead body. She testified on cross-examination that Mr. Moore was a man of his word, and usually did what he said he was going to do. Her testimony in effect is that while she went to the house for the real purpose of getting her things and finally leaving the deceased, she knew that he expected her to return to stay there with him. She stated that she did not fool him about this, but that he fooled himself as to her intentions. The negro boy informed Moore that the appellant was there, and he walked on up to where she was standing near the front porch. They then sat on the side of the porch talking for a while. She states that Moore was glad to see her, and glad to know that she had returned, and that the

conversation was very friendly until she told Moore that she had come for the purpose of getting her things to finally leave him; that Moore then appeared to be mad. He was in his shirt sleeves. She says that he then stated to her that he wanted to go in the house to get a match, and went in the room, returning within a very short time; that shortly after his return he told her she could not go, and she told him that she was going, and started to get up off of the porch, when Moore slapped her; that she slapped him back, and grabbed him about the neck with her left arm; and that about that time Moore secured the pistol from somewhere on his person and shot over her left shoulder; thereafter they fought and scuffled for possession of the pistol, and in some way got up the steps from the ground to the gallery, the gallery being about two and one-half or three feet from the ground. That all during the difficulty she and Moore were facing each other; that she went up the front steps before Moore; that the first shot, the one over her left shoulder, was fired on the ground; all of the other shots were fired while they were on the porch; that as soon as she realized that Moore had the pistol she began trying to get it, or that both began a scuffle for the possession of it; that at one time she had it, and hit Moore over the head several times, after which Moore thereafter had the pistol by the barrel with both hands, and she had it by the handle. She does not attempt to state how many shots were fired. The pistol either had five or six loaded cartridges in it before the shooting, and it seems that all of the chambers were fired. In addition to being shot in the face and chest, two of his fingers were either badly injured or shot in the difficulty, and he had six wounds on top of the head. There is some controversy in the record as to whether two of these wounds were made by pistol shots, or whether they were made by being struck on the head with the pistol. The wound in the face was powder burned. The wound in the chest was not a round, but rather an oblong wound. Some of the testimony for the state was to the effect that this wound had the appearance of having been inflicted by

a pistol ball which had struck something before hitting the deceased.

The testimony also showed that there was a powder burned bullet hole in the door leading from the porch to the kitchen in which Moore's body was found; that the height of this hole from the bottom of the door was about the same as that from Moore's feet to the place of the wound, or, in other words, judging from the position where Moore's body was found, the location of the wound in his chest, and the hole in the door, that this wound came from the outside through the door into Moore's chest. This door was partially open, with Moore's body lying just inside of the kitchen. There was testimony that he had, either under or on his right arm when his body was found, the coat of the negro boy who lived at his house. This negro boy testified that before the killing that day his coat was hanging on a nail on the back of this door.

The appellant testified that she did not know how many shots were fired; that they were all fired when they were scuffling over the pistol; that she did not go in the kitchen during the difficulty; that when Moore fell in the kitchen the pistol fell by his side; she then picked it up and tried to shoot herself with it, but it was empty. She testified that she then went into Moore's room and got his cartridges and got the negro boy to reload it for her. This boy, however, testified that she reloaded it herself.

Some of the state's witnesses testified that they could see Moore and this woman scuffling, at which time Moore had his hands up over his head; that they then saw Moore run into the kitchen with the appellant behind him.

After the shooting the appellant telephoned for the sheriff, who came out and arrested her. She was taken by him to Canton and there placed in jail. A special term of court was called, at which term she was indicted, tried, and convicted. The appellant made a motion for a change of venue, upon which testimony was introduced, which was overruled by the court.

There are four assignments of error argued for a reversal of this cause in this court. They are as follows: First, the action of the court in overruling the motion for a change of venue; second, the action of the court in overruling certain challenges for cause; third, in excluding certain letters written by the deceased to the appellant, beginning with their unlawful relationship and ending a few days previous to the killing, and also certain letters written by the deceased to a Hot Springs negro, and letters from the Hot Springs negro to this appellant; fourth, the refusal of certain instructions asked by the appellant, and also the giving of a murder instruction on behalf of the state—it being the contention of the appellant that she could only be convicted of manslaughter under the testimony.

First. We think the court was correct in overruling the motion for a change of venue. While the testimony upon this motion introduced by the state shows that around Lexington this killing had been discussed a great deal, and that most of the witnesses who lived in Lexington believed the appellant should be convicted, they all testified that they believed there was no bias or prejudice existing against her in the county. From this testimony alone we could not say that the court abused its judicial discretion in not changing the venue. However, viewing the trial as a completed whole, as it is our duty to do in considering this motion, and after a careful examination of the testimony of all of the prospective jurors who were summoned upon the special venire, we are thoroughly satisfied that the court was correct in not granting this motion. This examination shows that the court was very careful to excuse all prospective jurors who were in any ways doubtful about whether or not they could try the case fairly and impartially, and every juror who actually sat upon the panel stated that he could do so, and that he had no bias or prejudice whatever against this appellant. We therefore repeat in the language of the opinion of the court in the case of *Cheatman* v. *State,* 67 Miss. 338, 7 So. 205, 19 Am. St. Rep. 310, that:

"The trial as surveyed from its conclusion instead of its commencement, impresses us, as it did the court below, as being entirely free from any bias against appellant."

Second. Without going into the details of the examination of the jurors, suffice it to say that we have carefully examined the record, and find no error committed by the trial court in overruling the challenges for cause.

Third. The letters excluded by the court were not material to the guilt or innocence of the defendant, the question at issue before the jury. These letters merely showed an infatuation upon the part of the deceased for this woman, and that he did not want her to leave him and marry a negro in Hot Springs, but wanted her to remain with him. While the court did not permit the introduction of these letters, or testimony as to the contents of those which were lost, it permitted the appellant to testify to the unlawful relationship existing between them; that the deceased was the moving cause of it; that he was infatuated with her; that he did not want her to leave him, that he threatened to kill her if she did; that after she left him a week before the killing he insisted upon her returning; and that it was upon his insistence that she in fact did return. All of the state's witnesses as well as the appellant testified to this unlawful relationship. In fact there was practically no dispute about any of the material facts, except what occurred at the time of the difficulty. There was no material conflict in any of the testimony whereby any of these letters would in any way have corroborated the testimony of the appellant. The court was correct in excluding their contents from the consideration of the jury.

Fourth. A murder instruction in this case was proper. From the conflicts in the testimony between the appellant and the state's witnesses as to what occurred at the time of the killing and from the testimony of the appellant herself, the jury was authorized in believing that, though the appellant went to the home of the deceased at his invitation, yet she knew at that time that he (Moore) expected her to stay there; that he had told her that he would not

permit her to leave; that he would kill her before allowing her to do so, or that she would go over his dead body. She further testified that she knew he was a man of his word, who usually did what he said he would do; that she knew he was under the impression that she was there for the purpose of remaining, that he was fooled, or had fooled himself, about this; that her real purpose was to get her belongings and leave. She knew where Moore kept his pistol and the cartridges. The jury had a right to believe that she went in the room and secured this pistol with the determination, if necessary, to kill Moore in order to carry out her purpose of getting her belongings and leaving him, and that this purpose was as a matter of fact executed by her. The jury had a right to apply their common sense and common experience in considering this testimony with the physical facts and other circumstances shown by the record. The probability or improbability of the shooting occurring as testified to by the appellant was peculiarly a question for the jury. It is unnecessary to set out in detail the weakness of her testimony about the shooting and the difficulty.

There were several instructions refused the appellant. From an examination, however, of those given we are satisfied that every phase of her defense was covered by them.

.The judgment of the lower court is affirmed.

*Affirmed.*