DURR *v.* STATE.

June 9, 1952.

No. 38432 (59 So. (2d) 304)

D. A. McLeod, and A. W. McRaney, for appellant.

J. T. Patterson, Assistant Attorney General, for appellee.

McGehee, C. J.

This appeal was taken by Jim Brent Durr from a conviction of murder and sentence of death. The appellant contends (1) that he should have been granted a new trial on the ground that the verdict of the jury is against the overwhelming weight of the evidence offered in the support of his plea of self-defense; (2) that the trial court erred in refusing an instruction requested by the defendant that would have authorized the jury to find him guilty of no greater offense than the crime of manslaughter; and (3) that the trial court should have sustained the defendant's motion for a mistrial because of certain questions propounded to a witness for the State, but which were not answered upon objection thereto, in regard to why the officer who was killed had on that occasion armed himself and was accompanied by his brother to the home of Durr to arrest him on a charge of having resisted the officer on a previous visit to the home where he had gone on two consecutive days immediately prior to the homicide to execute a writ of replevin for a wagon. The officer had failed on each occasion

to take possession of the wagon or obtain a bond therefor, and the questions objected to had intimated that the officer had armed himself and obtained someone to assist him in making the arrest because of the reputation of the defendant.

On Friday the 13th day of April, 1951, the appellant Jim Brent Durr shot and killed Bernice Herrington, a constable in Simpson County, who had two days prior thereto served a writ of replevin on him for the possession of a wagon. The officer had gone alone and unarmed to the home of Durr on each of the two days immediately prior to the killing, and for some reason had failed to either take possession of the wagon or obtain a bond from Durr for its forthcoming to abide the judgment of the court in the replevin suit. On his third visit to the home he was accompanied by his brother Eugene Herrington and carried in his shirt pocket a warrant for the arrest of Durr on a charge of having resisted the officer in the previous attempt to execute the writ of replevin.

The proof discloses that on his first visit to execute the writ of replevin the officer found Durr and his wife in possession of the wagon near the barn lot and loaded with fertilizer and plow tools which the wife was attempting to carry to the field; that Durr, who is alleged to have been recovering from the mumps, was walking along near the wagon when the officer approached them, and that thereupon the journey to the field was abandoned on account of rain, when Durr and the officer returned to his house and the wife of Durr returned to the barn with the wagon and then came on to the house; that the officer read the writ of replevin to Durr and delivered him a copy thereof; and that the officer remained on the porch for about 40 minutes until the rain was over and during which time, according to the testimony of Durr and his wife, there was no unpleasantness of any kind between them and the officer.

It is not clear from the record as to whether the officer's failure to take possession of the wagon on that day was due to the fact that he had not gone there prepared to carry it away, or whether Durr had declined to either give bond for the wagon or to surrender possession thereof. But it does appear that on the next morning the officer again arrived on the premises and went first to where the wife of Durr was at work in the field near the house, asked as to the whereabouts of Durr, was informed that he was sick and in the house and that the officer thereupon went to the house and saw Durr in the presence of his wife and informed him that Mr. Hemby, the plaintiff in the replevin suit, did not want the wagon but wanted his money, and that Durr then claimed that the $50 balance of the purchase price that he owed on the wagon was not due until the fall of 1951, whereas it appears from other proof in the case that the balance had been past due since the fall of 1950. It is shown that subsequent to the homicide which occurred on the following day, the wife of Durr stated to the officers that he was doing a lot of cursing in the house on the occasion of this second visit of the officer. At any rate, the officer left the Durr home again without having taken possession of the wagon or having received a bond for the same. Both Durr and his wife as witnesses at the trial denied that there was any unpleasantness between the parties during the second visit of the officer and denied that he had refused to surrender possession of the wagon or to make bond.

At any rate, the officer left the premises and on the next morning made a charge against Durr for having resisted the officer in his attempted execution of the process. And the proof discloses without dispute that the tongue of the wagon had been removed therefrom and placed in a room of the Durr home prior to the homicide, indicating his determined purpose not to permit the wagon to be carried away from his premises by the officer.

On the third day the officer returned to the Durr home accompanied by his brother, as aforesaid, and upon their arrival they saw Durr's wife at the barn and the officer went first to see her and got her to accompany the officer and his brother to the house, where she said that Durr was in bed. Upon their arrival at the house a short distance from the barn, the wife went in the back door while the officer, accompanied by his brother, went to the front of the house. She informed Durr that the officer was there and wanted to see him, and she testified that Durr told her to tell him to come in.

Instead of going out the front door from the bedroom, where Durr was in bed fully dressed, she went out the back door and around the house to where the officer and his brother were standing near the front porch and told the officer that Durr said for him to come on in the house. According to the testimony of Eugene Herrington, the surviving brother, she was requested by the officer to open the door but declined to do so; the officer then called Durr by name and asked that he open the door.

Thereupon a little 7 year old girl opened the door when the officer told Durr, according to the testimony of his brother, Eugene Herrington, in substance that since you are sick why don't you come to town when you get up and arrange to settle the matter. Eugene Herrington testified that thereupon Durr jumped up from the bed and attacked the officer and shoved him out the door and off the porch; and that the officer and the witness then were leaving the premises and that when they were about 40 or 45 feet from the house they heard a noise as if a door had slammed and upon looking back they saw Durr standing in the door with his shotgun and was told by the officer, "Jim Brent, don't you shoot out this way", and that then Durr fired and killed the officer; that as the officer was falling to the ground his pistol, which he had drawn for the first time after seeing Durr at his front door with the shotgun, was discharged while the officer was falling to the ground; that the wit-

ness Eugene Herrington then picked up the pistol near the body of his deceased brother and was then shot and wounded by Durr; that the witness then left the premises immediately. The body of the officer was found at about 14 steps from the front of the house in the direction that they were going in returning to their truck. The officer had been shot in the heart and lungs.

On the other hand, Durr and his wife testified that when the officer entered the bedroom where Durr was lying on the bed, he stated to Durr that, "I have been told that you are a smart Negro and I have come here this morning for one single purpose, and that is to kill you. Get up and fight for your life"; that the officer then caught Durr by the left foot, dragged him out of the bed onto the floor and that while Durr was lying on his back on the floor the officer stood over him and shot him with the pistol and that the shot glanced Durr's hip, causing a slight flesh wound; that the officer then per-. mitted Durr to get up off the floor, knock the pistol out of the officer's hand, which the officer then recovered, and that while the officer was standing with the pistol in his hand Durr caught him in the back of the shirt collar and in the seat of his pants, shoved him out across the porch and that as soon as the officer "steadied himself" he started to go back up the steps and said to his brother, "Let's go in and finish killing him"; and that it was then that Durr shot and killed the officer.

The jury rejected the theory of self-defense thus interposed by the defendant Durr and evidently on the ground that it would seem unreasonable that if the officer had informed Durr that he was there to kill him and had shot once at Durr while the latter was lying on his back on the floor, he would have failed entirely to inflict a serious wound on the body of Durr, or would have thereafter permitted him to get up and knock the pistol out of the officer's hand onto the floor and then allow the officer to recover the pistol, or that the officer would have then permitted Durr to put him out of the house and off the

porch without the officer having fired or attempted to fire another shot in the meantime, although he was standing with a loaded pistol in his hand, according to the testimony on behalf of the defendant. The jury doubtless believed from the evidence that if the officer had shot at the defendant and later retrieved the pistol from the floor, Durr would have clinched him and struggled for the possession of the weapon to protect his life. Then, too, the jury had the testimony of the sheriff of the county and of a highway patrolman that a thorough search of the floor failed to disclose that a bullet had been fired into the floor after having allegedly glanced the hip of Durr. Moreover, the body of the officer was found 14 steps from the house and it was not shown that there was any blood found anywhere except at the body of the officer.

Under the foregoing facts and circumstances the issue was clearly presented to the jury as to whether or not the defendant Durr had shot and killed the officer in self-defense, and we are of the opinion that the case was properly submitted to the jury under the sole issue of murder or self defense under all the facts and circumstances of the case.

The indictment was first returned at the regular September 1951 term of the circuit court, but upon motion of the defendant Durr the cause was continued. Thereafter the circuit judge called a special term of the court which convened on November 19, 1951, to remain in session as long as business required, or until the term was adjourned by order of the trial judge.

At the November special term the original indictment was dismissed at the instance of the State and a new indictment was returned by the grand jury, along with a number of indictments against other alleged offenders. The jury boxes having been exhausted, or practically so, at the September term, they were refilled prior to the November special term of the court, and the names of Negro qualified electors had been placed in the box, con-

trary to the general practice that had been previously followed. There were 6,701 qualified electors in the county and only 37 of them were Negroes. The names of two Negroes were drawn for jury service at the November term on the grand and petit juries summoned for the term, and upon motion of the State a special venire of 125 men was drawn from the jury boxes to try the case now before us. The State accepted two Negroes on the jury panel and tendered the jury to the defendant composed of 10 white men and 2 Negroes. The defendant accepted one of the Negro jurors and excused the other, and hence the verdict of guilty with the death penalty was concurred in by 11 white men and one Negro.

 ██ The defendant had made a motion for a change of venue but offered no proof in support thereof. The State introduced 28 witnesses, showing that there had been no such prejudgment of the case as would prevent the defendant having a fair and impartial trial in Simpson County, and, therefore, the motion for a change of venue was properly overruled.

 ██ The defendant also made a motion to quash the indictment and the special venire on account of the alleged systematic discrimination against Negroes as to jury service in the County during the past several years prior to the trial. These motions were properly overruled since the proof clearly disclosed that a proper proportion of Negroes according to the number of Negro male qualified electors in the county were summoned for regular jury service at the Special Term in November and on the special venire, in comparison with the number of white qualified male electors in the county who were drawn and summoned for service.

 ██ The District Attorney undertook to show that the officer had been advised to get some one to accompany him on the third visit to the home of the defendant Durr and had gone there armed with a borrowed pistol on that occasion, acting upon the advice of other persons. As stated in the first paragraph hereof, an

objection was made to this inquiry. The objection was sustained and the question was never answered. There was a motion for mistrial on account of the question having been asked and this motion was overruled.

We have concluded that under all of the facts and circumstances the alleged error was not such as to prejudice the rights of the defendant and prevent a fair and impartial trial; that the jury was amply justified from the evidence in believing the defendant guilty beyond every reasonable doubt, and that the judgment and sentence of the trial should, therefore, be affirmed.

Affirmed and Friday, July 25, 1952, is fixed as the date for the execution of the death sentence.

All Judges concur.