## GOLDSBY *v.* STATE

No. 39739 March 28, 1955 78 So. 2d 762

1

March 5, 1956 86 So. 2d 27

*John W. Prewitt,* Vicksburg; *Rupert Ringold,* Winona; *Moore, Ming & Leighton,* Chicago, Illinois, for appellant.

6

*Wm. E. Cresswell, Asst. Atty. Gen.,* Jackson, for appellee.

*Barnett, Jones & Montgomery*, Jackson, for appellee.

LEE, J.

Robert Lee Goldsby was indicted in the Circuit Court of the Second Judicial District of Carroll County for the murder of Mrs. Moselle McCorkle Nelms. The jury found him guilty as charged, and the court sentenced him to death by electrocution. From the judgment entered, he appealed.

The killing occurred on September 4, 1954. At a subsequent habeas corpus trial Goldsby was represented by counsel of his own choosing. The indictment was returned on November 8, 1954, at which time he was represented by other counsel of his own choice, George N. Leighton of Chicago, Illinois, who was present at the arraignment that day. By agreement, the cause was set for call for November 10th. However, on that date, Leighton informed the court that he had withdrawn from the case. Since the defendant was then without counsel, it became necessary for the court to appoint counsel for him. There were only two lawyers in Carroll County, Maurice Black, county attorney, and Crawford Neill.

Neill was physically unable to assume the defense. The court then appointed Rupert Ringold of Winona, Mississippi, and the case was passed until the next day. At that time Ringold asked permission of the court for John W. Prewitt, an attorney of Vicksburg, appearing at the instance of relatives of the accused, to be associated in the case. This request was granted and both Ringold and Prewitt assumed the defense.

A motion for a change of venue, in compliance with Section 2508, Code of 1942, was filed; but no evidence was adduced in support thereof.

The State, in opposition to the motion, offered thirteen witnesses, consisting of the circuit clerk, the chancery clerk, a justice of the peace, two deputy sheriffs, the sheriffs in the two districts of the County, the county agricultural agent, the superintendent of education, the town marshall of Vaiden, a member of the board of supervisors, an automobile dealer and service station operator, and a farmer. One or two statements of two of the witnesses, if isolated from everything else, might be construed as supporting the motion. But the over-all effect of the evidence was that the public interest, at the time of the killing, was no greater than usual in that kind of case; that there was no widespread discussion of it at the time or since; that there was no hatred, ill will, malice or prejudgment against the defendant; that there was the desire on the part of those who expressed themselves, except in several instances, that the defendant should have a fair and impartial trial; that the defendant was transferred first to a jail in Jackson and then to one at Louisville not because of any ill will or feeling against him, but because the county jail was inadequate for the confinement of a person, charged with a serious offense; that only twenty-five or thirty persons were present in the courtroom at the time of the arraignment; that the courtroom was only one-third full when the motion was being heard; and that the defendant

could secure a fair and impartial trial in the Second Judicial District of Carroll County in accordance with the law and the evidence.

 At the conclusion of the hearing, the trial judge observed that the testimony showed overwhelmingly, and he did not have the shadow of a doubt but that the defendant could get a fair and impartial trial there. Hence he overruled the motion. His action was fully sustained by the evidence. Walden v. State, 129 Miss. 686, 92 So. 820; Long v. State, 133 Miss. 33, 96 So. 740; Mackie v. State, 138 Miss. 740, 103 So. 379; Dalton v. State, 141 Miss. 841, 105 So. 784; Wexler v. State, 167 Miss. 464, 142 So. 501; Shimniok v. State, 197 Miss. 179, 19 So. 2d 760; Bone v. State, 207 Miss. 20, 41 So. 2d 347; Gaddis v. State, 207 Miss. 508, 42 So. 2d 724; Durr v. State, 214 Miss. 658, 59 So. 2d 304; Wheeler v. State, (Miss.) 63 So. 2d 517, Cert. denied 74 S. Ct. 67.

Moreover, the special venire of one hundred men, from which to secure the trial jury, was drawn from the whole county. If the answers of the potential jurors on their voir dire examination had been desired, counsel could have had the same taken and made a part of the record merely by asking. But no request therefor was made. In addition, it was not shown in the record that it was necessary for the defendant, in the selection of the jury, to exhaust his twelve peremptory challenges.

It is obvious therefore that there is no substantial basis on which to maintain that the trial court committed error in overruling the motion for a change of venue.

Mrs. Moselle McCorkle Nelms and husband, B. S. Nelms, operated a dairy bar on the west side of U. S. Highway 51 about one and a half miles north of Vaiden, Mississippi. The building was brick veneer, twenty-six by thirty-four feet, and was situated about seventy-five feet from the pavement. About twenty-five feet east of the building, and between it and the pavement, were located two gasoline pumps. Driveways, both north and

south, afforded access to the place. The ground was substantially level and was covered with washed gravel about two or three inches deep.

About 8 o'clock on the morning of September 4, 1954, a blue Dodge automobile, with a Missouri tag, traveling south on the highway at a rapid rate of speed, turned somewhat abrubtly off the highway and into the grounds of the dairy bar. It scarcely missed the gasoline pumps and Dan Willis' car, parked about 12 feet from the corner of the building, and stopped about fifty feet from the southeast corner of the building. Five Negroes were in the car—three men, Robert Lee Goldsby, Robert Gillion, and Willie Turner, and two women, Rosa Moore and Laura May Goldsby, wife of the defendant. They had left St. Louis, Missouri, about 12 o'clock the night before. Robert Gillion was driving at the time. Goldsby and Gillion and the two women all got out of the car. There were two versions as to the subsequent developments.

As Dan Willis of New Orleans, Louisiana, a rodman in steel construction work, was approaching the cafe a few minutes before, his horn started blowing and he turned into the station to disconnect it. When this was done, he checked his oil, found that it was low, and was adding a quart, when the Missouri car came into the grounds at high speed, almost hit the pumps and his car, and knocked gravel against both the car and the building. He estimated the speed at 50 miles an hour. Two men and two women got out of the car. B. S. Nelms was at the back of the building at the time and he went to the car and asked the Negroes what they meant by driving in that manner, and told them to get in their car and leave, as they were not wanted or allowed there. The parties all got back in the car and were talking. Nelms then went into the front of the dairy bar, and, after a short time, came out with a rubber hammer in his left hand. The handle was about 10 inches long and the rubber portion was about two by three inches. Nelms was in his shirt

sleeves and his right hand was swinging. The witness could tell that there was something in Nelms' right pocket. Nelms got within about two steps of the car, on the left side, lowered his head and said, "I said for you all to leave, and I mean now". Immediately a pistol shot was made by the man under the steering wheel, Goldsby. The bullet struck Nelms in the mouth. He flinched and struck the side of the car with the rubber hammer and fell flat on his face on the ground. Two other shots were fired in rapid succession at Nelms on the ground, one of which hit him in the hip. About that time, Mrs. Nelms in a white uniform with short sleeves, came running from the building with her hands in the air and nothing in them, and screamed to Goldsby either to "quit shooting my husband" or "you have shot my husband". Goldsby then fired the fourth shot and Mrs. Nelms half way turned and fell on her face. The witness was positive that the defendant saw her, unless he closed his eyes. He estimated the time at between three and five seconds between the third and fourth shots. Goldsby had turned his direction after the first shot; and after the third shot, he turned more to the left. Mrs. Nelms said nothing after the shot that struck her under her right armpit. She died within thirty or forty seconds. The witness was positive that the motor was running when the parties got back into the car with Goldsby under the steering wheel. He had also noticed that the exhaust pipe was "sizzling" just as Nelms walked up to the car the second time. Immediately after the fourth shot, the car drove away.

The testimony of B. S. Nelms coincided with and corroborated that of Dan Willis in all substantial particulars. He explained that the manner in which the car had been driven into his place by people, apparently from another state and whom he did not know, caused him apprehension as to their purpose; and he wanted them to get off of his premises. He asked them to do so

but they paid no heed. Hence, because they acted suspiciously and he was afraid of them, he took the mallet in his hand and put his pistol in his pocket. In his shirt sleeves, he walked up to the side of the car, with nothing in his hand but the mallet, drew no weapon of any kind on Goldsby, but merely bent down slightly in order to tell the driver "I guess you Negroes didn't hear me tell you to leave here". Immediately Goldsby shot him in the mouth. He had no recollection of striking the mallet against the side of the car. He fell to the ground on his face, and Goldsby continued to shoot at him on the ground, one of the bullets taking effect in his hip. He said that there was a variation of a second or two in the first three shots. About the time of the third shot, he heard the screen door of the dairy bar slam and his wife scream to "quit shooting my husband". The fourth shot, which killed his wife, came several seconds after the third shot. As the car pulled off, he managed to get his pistol out of his pocket and fired at it three times.

Dr. H. L. Howard testified that the wound on Mrs. Nelms' body was about the size of the end of his little finger, and was under the right armpit. The bullet went through her heart and lungs. If it had come out, the point of exit would have been under the left armpit.

Richard F. Byrd, sheriff of Holmes County, on the lookout for the car, finally stopped it after giving chase for four or five miles at a speed of from sixty-five to seventy-seven miles an hour, and also shooting the left rear tire. At first, Goldsby, who was driving, disclaimed any knowledge of the shooting, and said that he had not been near Vaiden. Robert Gillion, in the presence and hearing of Goldsby, told the officer that Goldsby "shot them", but Goldsby said nothing. Finally, however, he admitted the shooting.

A map, prepared at the instance of the defendant, was introduced in evidence, and counsel for the defendant, on cross examination of the witnesses, had them to indi-

cate all locations together with the position of the Willis car and the Goldsby car and the relative positions of B. S. Nelms and Mrs. Nelms after they had fallen. According to the map, Mrs. Nelms' body was approximately six or eight feet north of where Nelms was shot down.

Robert Lee Goldsby, testifying for himself, admitted that the automobile was driven into the grounds in the reckless manner which has been mentioned hereinabove. He said that the purpose in stopping was to get some gas and so that the two women could use a rest room; that Nelms came to the car and told them to "Get the hell out of here"; that the motor had been stopped and he and Gillion changed places and he was trying to start the motor. While he was doing this, Nelms came back with the rubber tire hammer in his left hand, and with his right hand in the pocket where he could see the handle of a pistol; that Nelms then asked if they were not going to leave. He replied that they were as soon as he could get the car started; that Nelms hit him on the side of the head with the tire hammer; that he, Goldsby, then reached in the glove compartment, got his pistol, and fired four shots at Nelms as fast as he could pull the trigger; that he did not see Nelms fall, and in fact did not see him on the ground or after the first shot. He did not change the position of his hands. He said that he was nervous, scared and shot for the purpose of protecting himself. He said that he did not see Mrs. Nelms come to the car or after she got to it, and did not hear her say "quit shooting my husband", or words to that effect, or anybody hollering. He admitted that after the car pulled away he left the highway and pursued a circuitous route. He gave the pistol to his wife and told her to do something with it. He also placed tape over the hole, which was made by one of Nelms' shots as the car was leaving. He further said that he did not hear the siren as the officers were pursuing him for about four miles.

Rosa Moore testified that the motor was killed when the car stopped, and Goldsby had trouble starting it again; that after Nelms told them to leave, he called for somebody to bring him something, and that Mrs. Nelms gave him the hammer and pistol; and that thereupon he walked up to the car by the side of Goldsby and said, ''Didn't I tell you Negroes to get away from here; you Negroes from St. Louis think you are smart'', and hit at Goldsby with the hammer but it struck the side of the car. Goldsby then reached in the glove compartment and the shooting started. She did not know whether Goldsby shot Nelms after he was on the ground, but she said that she heard Mrs. Nelms scream ''you shot my husband'', and she looked and saw Mrs. Nelms standing near her husband, who was lying on the ground; and that she did not know that Mrs. Nelms had been struck until they arrived at Jackson. She stated that Goldsby had some beer and whiskey in the car.

Willie Turner's evidence was in substantial agreement with that of Rosa Moore. He said, however, that Goldsby reached into the glove compartment about a minute before Nelms approached the car; and that Mrs. Nelms was at the car near Goldsby, waving her hands over her head, and that he saw nothing in them.

Robert Gillion testified that he killed the motor when the car stopped, but that, when the shooting was over, it was running. He said that Goldsby already had the pistol in his lap when Nelms approached the car the second time; that Nelms struck at Golsby with the hammer, but that it was not a hard lick; and that Nelms was flat on the ground when Goldsby shot the third time. After the third shot, Mrs. Nelms came running and saying ''you have shot my husband'', and that she did not have anything whatever in her hands.

The State's case amounted to this: (1) Because of the reckless driving of the automobile, in which liquor and beer likely played their part, Nelms asked the Negroes

to leave. (2) They did not comply with his request. (3) Because they were strangers and acted suspiciously, Nelms was afraid of them, and therefore put his pistol in his pocket and took the rubber hammer along, when he went to ask them again to leave. (4) Nelms did not threaten Goldsby with any weapon and was not conscious of striking the car with the rubber hammer. (5) He merely asked them to leave then. (6) When he made the demand, Goldsby, who had taken his pistol from the glove compartment and had it in his lap, immediately shot Nelms in the mouth and he fell flat on his face on the ground. (7) Goldsby continued to shoot at Nelms as he lay helpless on the ground, and one of the two bullets actually struck him in the hip, as he lay upon the ground. (8) Mrs. Nelms, hearing the shots, ran out near the car, without a weapon of any kind, with her hands in the air, and screamed to Goldsby to quit shooting her husband or that he had shot her husband. (9) Goldsby then turned his gun upon Mrs. Nelms, defenseless, and shot her to death. (10) Regardless of what had happened before, Goldsby, in the interval between the third and fourth shots—from three to five seconds— had time to form malice, and did form malice and murdered the woman.

██ ██ "The chief distinction between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter." Carter v. State, 199 Miss. 871, 25 So. 2d 470. In Pairlee (Alias Parllee) Rogers v. State, (Miss.) 76 So. 2d 702, when according to the State's evidence, Rogers had stabbed the deceased to death at a time when she was not in any immediate danger, real or apparent, of losing her life or suffering some great bodily harm at the hands of the deceased, the Court said: "If the killing occurred under those circumstances, it was either murder or manslaughter; if done without malice. Both guilt and the grade of the homicide were for the determination of the jury. Hence

16

it was not error to submit the issue as to murder." See also Denham v. State, 218 Miss. 423, 67 So. 2d 445.

■■ "The deliberate design to effect the death of another may be formed in an instant. There is no particular measure of time necessary for its formation." Johnson v. State, 140 Miss. 889, 105 So. 742; Williams v. State, 163 Miss. 475, 142 So. 471; Motley v. Smith, Sheriff, 172 Miss. 148, 159 So. 553; Carter v. State, supra; Howard v. State, 212 Miss. 722, 55 So. 2d 436.

■■ The instructions submitted the issues of guilt or innocence and the grade of the homicide, that is, murder or manslaughter. If the jury believed the State's evidence, it was warranted in finding the defendant guilty of murder beyond a reasonable doubt.

■■ Of course, disputed issues of fact are for the jury. Clanton v. State, (Miss.) 49 So. 2d 267; Hatcher v. State, 210 Miss. 661, 50 So. 2d 387; Miller v. State, (Miss.) 51 So. 2d 576; Howard v. State, 212 Miss. 722, 55 So. 2d 436, and other authorities too numerous to mention.

■■ It follows that the court properly refused the instruction, requested by the defendant, to limit the grade of the homicide to manslaughter.

■■ Among the fifteen instructions given by the court for the defendant, the two following instructions fairly presented the issue of self defense, to-wit:

"The court instructs the jury that if they believe from the evidence that the defendant had reasonable grounds to apprehend a design on the part of Mr. Bryant Nelms to do him some great personal injury, that there was danger of such design being accomplished, then the defendant was justifiable in acting upon such appearance, if they indicated danger, even to the taking of the life of Mr. Bryant Nelms and Mrs. Moselle Nelms, if they were acting in concert."

"The court instructs the jury, for the defendant, that where one is attacked by several assailants at the same time, he is justified in acting upon the hostile demonstra-

tion of any one of them and if you believe from the evidence in this case that Robert Lee Goldsby was in danger of the loss of his life or of great bodily harm at the hands of Mr. Bryant Nelms or Mrs. Moselle Nelms, or any one of them, that the defendant has the right to take the life of any one of them, or all of them, if necessary to save himself, although it develops afterwards that only one of them is armed with a deadly weapon and therefore you must acquit.''

The Court refused the following instruction: ''The court instructs the jury for the defendant that the law is that a person assaulted, or about to be assaulted, with a deadly weapon, is not required by the law to wait until his adversary, or any person acting in concert with the said adversary, is on equal terms with him, but may rightfully anticipate their action and kill either one or both of them, when to strike in anticipation, reasonably appeared to be necessary to his self defense; and unless the jury are satisfied to a moral certainty and beyond a reasonable doubt that Mrs. Moselle Nelms was not acting in concert with Mr. Bryant Nelms at the time of the killing and Mr. Bryant Nelms was not attempting to draw or use a deadly weapon, then they must find the defendant not guilty.''

The Negroes were on the Nelms property. If they declined to leave, after his request, they became trespassers. In that event they were at fault and in the wrong in resisting his right to remove them. Cotton v. State, 135 Miss. 792, 100 So. 383. According to the testimony of the defendant, he did not see Mrs. Nelms at the time of the shooting, did not know that she was about the scene, and did not hear her screaming to him. The only witness, whose testimony in any way undertook to make her a participant, was Rosa Moore, who said that when Nelms ''called for somebody to bring him something'', Mrs. Nelms came out of the front door of the cafe and gave him the hammer and something else, but

she did not know what it was. Against this was the testimony of Dan Willis that, when Nelms came out of the dairy bar, he had the hammer in his left hand; and Nelms testified that he got both the hammer and the pistol in the dairy bar.

The instruction presumed that Nelms had no right to eject trespassers from his premises; that he was attempting to draw or use a deadly weapon; that the defendant had the right to shoot Nelms; that Mrs. Nelms was acting in concert with her husband; and that, therefore, the defendant had the right to shoot them both.

In addition, the instruction wholly ignored the State's proof, which, if believed, did not warrant the conclusion that Nelms was an aggressor. Besides even if the defendant was justified in shooting Nelms in the first instance, it was still a question for the jury as to whether he was justified in using further force, as Nelms lay helpless on the ground. And likewise, since all of the witnesses said that, at the time when Mrs. Nelms was shot, she was unarmed, with her hands in the air, and was screaming "you have shot my husband" or "quit shooting my husband", it could not be said, as a matter of law, that she was acting in concert with her husband in making an unlawful assault, if he were doing so, for the jury, on the contrary, was well warranted in finding that this defenseless woman was in no way to blame, but was merely pleading for the life of her husband.

The instruction was erroneous, misleading and confusing, and was properly refused.

The evidence in this record demonstrates that this killing was utterly inexcusable. According to the overwhelming weight of the evidence, consisting of the sworn testimony and the position of the victims, as shown by the map, it was clear that this was not a case where the defendant, in hastily shooting at Nelms, for some unexplained reason, happened to hit Mrs. Nelms. They were not in line. They were at least six or eight feet

apart. The wound in the armpit was conclusive that her right arm was elevated. The shooting of Mrs. Nelms, under the circumstances, evinced malice. The jury was fully warranted therefore in finding, beyond a reasonable doubt, that the defendant was guilty of murder.

No reversible error appears in the record. The cause is therefore affirmed; and Friday, May 13th, 1955, is fixed as the date for the execution of the death penalty in the manner provided by law.

Affirmed and Friday, May 13, 1955, fixed as date for execution of the death penalty.

All Justices concur.

## ON MOTION TO SET NEW EXECUTION DATE

January 16, 1956 84 So. 2d 528

Lee, J.

At the November 1954 term of the Circuit Court of the Second Judicial District of Carroll County, Robert Lee Goldsby was convicted of the crime of murder and was sentenced to suffer the death penalty. An appeal was prosecuted to this Court. On March 28, 1955, the sentence and judgment were affirmed, and Friday, May 13, 1955 was fixed as the date for the execution of the sentence. 78 So. 2d 762. Thereafter an appeal was granted to the Supreme Court of the United States. That Court, at its October 1955 term, on the 12th day of December 1955, in Cause No. 279 Misc., denied the petition of Robert Lee Goldsby for writ of certiorari as shown by a certified copy of the order by that Court now on file in this Court.

The Attorney General of the State has filed a motion, calling attention to the foregoing facts, and suggesting that this Court now fix a new date for the execution of the sentence. Service has been made in accordance with the rules.

The motion is sustained; and Friday, February 24, 1956, is hereby fixed as the date for execution of the death sentence in the manner provided by law.

All Justices concur.

## ON PETITION FOR WRIT OF ERROR CORAM NOBIS AND FOR WRIT OF HABEAS CORPUS

HALL, J.

The appellant, Robert Lee Goldsby, was convicted of murder in the Circuit Court of Carroll County, Mississippi, at the November 1954 term. On appeal to this Court his conviction was affirmed on March 28, 1955. Goldsby v. State, 78 So. 2d 762, not yet reported in the State Reports. Thereafter he petitioned the United States Supreme Court for a writ of certiorari, and the prayer of his petition was denied on December 12, 1955. 350 U. S. 925, 76 S. Ct. 216, 100 L. Ed. 138. On January 16, 1956, this Court fixed the date of his execution for February 24, 1956. Goldsby v. State, 84 So. 2d 528.

On February 21, 1956, the appellant Goldsby filed in this Court pursuant to Chapter 250, pages 281-282, Laws of 1952, a petition for writ of error coram nobis. On the same day, the date for execution of the sentence being only 3 days distant, we entered an order pursuant to the provisions of Section 8 of said Chapter 250 staying the execution of the sentence until further order of this Court and we set the hearing of the petition for February 28, 1956, in the Supreme Court room in the City of Jackson, Mississippi. On the appointed date counsel for the appellant and for the State appeared and argued the petition. The petition is divided into two general sections, the first being on the ground of newly discovered evidence, and the second being on the denial of federal constitutional rights. At the argument, counsel for the petitioner-appellant stated orally to the Court that he would abandon that part of his petition directed to newly discovered evidence, but since there is no official record

of such abandonment, we deem it necessary to deal with that ground as well as the second ground.

It is first contended by petitioner that after the denial of the writ of certiorari by the Supreme Court of the United States petitioner, by members of his family, had discovered that Bryant Nelms, the husband of the decedent named in the indictment, after the shooting of decedent, was heard to say that he had shot the decedent while attempting to shoot the petitioner, and the petition incorporates by reference the entire transcript of the proceedings of his trial in the lower court. We have carefully read the transcript again and we find that from the testimony of the said Bryant Nelms and from the testimony of a disinterested eyewitness, the petitioner first shot Bryant Nelms, striking him in the mouth and in the hip, and the said Bryant Nelms was prone upon the ground at the time when the decedent, his wife, came out of the Dairy Bar waving her arms in the air and telling the petitioner not to shoot her husband again, whereupon the petitioner turned his pitol upon Mrs. Nelms and shot her one time, the bullet striking her underneath the right arm and going almost entirely through her body, striking both the lungs and heart. She immediately fell to the ground and was dead almost instantly, whereupon the petitioner drove his car away from the place, changing to a southeasterly direction and, as he was escaping and after Mrs. Nelms was already dead upon the ground, Mr. Nelms raised up on his elbow and then for the first time managed to get his pistol out of his right pants pocket and began shooting at the fleeing automobile in which petitioner was riding, striking the automobile one time. According to all of the proof in the original record, Mrs. Nelms was dead before this shooting by Mr. Nelms occurred. He was not shooting at or toward his wife, and it is utterly impossible that he shot and killed his wife while undertaking to shoot the petitioner.

Moreover there is attached to the answer for the State an affidavit of Bryant Nelms denying that he shot his wife and denying that he has ever told anyone that he shot his wife, and there is no proof to the contrary before us. It is charged in the petition that Mr. W. A. McCorkle, the father of Mrs. Nelms, has knowledge and would testify that Mr. Nelms told him that he accidently shot his wife while undertaking to shoot the petitioner, and there is attached to the answer of the State the original affidavit of the said W. A. McCorkle denying said charge in toto and there is no proof to the contrary before us. ▮▮ ▮▮ The burden of proof on this hearing was upon the petitioner and it was evidently in recognition of this fact that he announced in his oral argument that he would abandon that part of the petition which raises the question of newly discovered evidence.

The petition further charges, and the record shows, that a bullet was taken from the body of the decedent and that the pistol used by the petitioner, and the bullet taken from the body of decedent, were submitted to ballistic examination and test, and that the report thereof was not offered in evidence in the trial of the case and if produced would show that the bullet was fired, not from the pistol used by petitioner but by the pistol used by Mr. Nelms. It is true that no ballistic report was offered in evidence by the State at the trial. The record shows that the pistol used by the petitioner was taken from petitioner's wife after his apprehension many miles from the scene of the shooting. The State exhausted every effort to identify this pistol as the one used by petitioner, but over repeated objections the trial court refused to admit the pistol in evidence because of insufficiency of identification by the State. At the trial petitioner was the last witness who testified, long after the State had rested its case, and he then identified the pistol used by him as being the same one which was taken from the person of his wife, and then for the first time the pistol

was admitted in evidence, at a stage of the proceeding when it was entirely too late for the prosecution to put the ballistic report in evidence. However, in its answer to the present petition, the State has exhibited a photostatic copy of the report from the Federal Bureau of Investigation which shows that the bullet taken from the body of Mrs. Nelms was fired from the pistol which was used by petitioner, which was a .32 caliber Colts revolver, and was a different caliber from that which the record shows was used by Mr. Nelms.

 ██ Not only did the petitioner fail to offer any proof in support of his allegations as to newly discovered evidence, ██ but moreover the rule is well settled that the writ of error coram nobis will not lie for newly discovered evidence going to the merits of the issues tried in the court below. We had occasion to deal with this question fully in Wetzel v. State, 76 So. 2d 194, 198-199, not yet reported in the State Reports, wherein the authorities were reviewed and we said:

"Petitioner contends that on the basis of his petition and the affidavits of Dye and himself, he is entitled to a new trial on the ground of newly discovered evidence. But it is well established both in Mississippi and elsewhere that the writ of error coram nobis can not be invoked for newly discovered evidence going to the merits of the issues tried in the court below. 24 C. J. S., Criminal Law, Sec. 1606, pp. 149-150; 49 C. J. S., Judgments, Sec. 312, pp. 567-568; 31 Am. Jur., Judgments, Sec. 804; Annotation, 1924, 33 A. L. R. 84; Fugate v. State, 1904, 85 Miss. 94, 37 So. 554; Cummins v. State, 1926, 144 Miss. 634, 110 So. 206; White v. State, 1930, 159 Miss. 207, 131 So. 96; Powers v. State, 1933, 168 Miss. 541, 548, 553, 151 So. 730; Buckler v. State, 1935, 173 Miss. 350, 356, 161 So. 683; Roberson v. Quave, 1951, 211 Miss. 398, 51 So. 2d 62, 777; Wheeler v. State, Miss. 1954, 70 So. 2d 82. The reasons for this well established rule are stated in 31 Am. Jur., Judgments, Sec. 804, foot-

note 7: 'If the writ of coram nobis were allowed on the ground of newly discovered evidence, after judgment, the defendant might discover or fabricate evidence which would have been material on the trial, that it would be necessary for him only to obtain the writ, assign errors in fact, and proceed to try the whole matter over again, and that such a practice would render the validity of the judgments of the courts too uncertain to comport with sound policy, safety, or public convenience.''

■■ ■ The second section of the petition before us is based upon the grounds of the denial to petitioner of federal constitutional rights consisting primarily of the alleged fact that the petitioner is a member of the Negro race and that in the county where he was tried Negroes have been systematically excluded from jury service. So far as the whole record before us is concerned, including both that of the original trial and of the petition now before us, there is no showing whatsoever that Negroes are or have been systematically excluded from jury service in the county where he was tried. So far as we know from the record of the trial, there may have been Negroes on the grand jury which indicted petitioner and there may have been Negroes on the jury which convicted him. The record is wholly silent as to this matter. So far as it shows petitioner was indicted and tried by a fair and impartial jury and ■■ ■ we cannot take judicial notice of something as to which there was no proof whatsoever.

■■ ■ After this case was originally decided by us on March 28, 1955, and the suggestion of error overruled on May 2, 1955, petitioner applied to the United States Supreme Court in Cause No. 279 on the docket of said court at the October Term 1955, and at that time, as shown by the original petition on file with the Supreme Court of the United States, he raised this identical question, and that court denied certiorari as hereinabove referred to and we think that the judgment of that court

constitutes res adjudicata and that the question is no longer subject to review.

Petitioner alleges that his attorney prepared and had ready to file a motion for a change of venue and a motion to quash the indictment, and that these documents were in his hands, already prepared and ready for filing, on November 10, 1954, and there was also already prepared and in his hands a petition for removal of this cause to the federal court under the provisions of Title 28, Section 1443 and Sections 1446-1449 of the United States Code Annotated, and this petition was ready for filing and the affidavit thereon had already been executed on November 9, 1954. It appears that on that date the mother, brother and aunt of the petitioner, being then dissatisfied with the services of the attorney who had allegedly been employed by petitioner's aunt in Gary, Indiana, employed other counsel to represent petitioner, and thereafter on November 10, 1954, which was two days after petitioner's indictment, his Chicago counsel withdrew from the case without filing the documents which he had prepared and which he had in hand, and abruptly left Mississippi and returned to his home in Chicago, notifying the trial court that he was no longer connected with the case. None of the documents which the Chicago attorney prepared were ever filed in or brought to the attention of the trial court. Prior to the preparation of these documents the attorney from Chicago on November 8, 1954, had requested the trial court to grant him additional time in which to prepare his motion and petitions, and the trial court had granted him two days in which to do this work and had stated to him that he would give him a hearing on any motions or petitions which he desired to file.

After the withdrawal from the case of the Chicago attorney the court appointed a local attorney to defend petitioner, who, together with the employed attorney from Vicksburg, Mississippi, who had been hired by

petitioner's relatives, and a review of the record of the trial of this case shows that both of these attorneys, who are thoroughly competent and who stand high among the legal profession in Mississippi, did an excellent job in the defense of this case, not only at the trial in the lower court but also on the appeal to this Court.

We may here observe that a similar motion to quash the indictment and also a motion for a change of venue, were filed by other counsel in the case of Robert Gillian, a colored man who was present at the time of the killing in question and who had been indicted by the same grand jury as an accessory after the fact. Copies of those motions as well as copy of a petition for removal to the federal court which was not filed, are exhibits to the petition now before us, but the record shows that after the trial of petitioner Goldsby the court dismissed the proceeding against Robert Gillian for the reason that the evidence brought out upon the trial of Goldsby was insufficient to make a case on the indictment against Gillian.

██ ██ There is much said in the petition now before us about petitioner being confined in a jail at Louisville, Mississippi, and not at Vaiden, the county seat of Carroll County, where petitioner was tried. According to the last federal census Vaiden is a little town of 583 population. According to the record before us there is no jail in Vaiden and no place where petitioner could have been there incarcerated. Section 2499 of the Mississippi Code of 1942 provides that the presiding judge of the county may, either where there is no jail sufficient for the safe keeping of the prisoner, or, where the circuit judge shall think it expedient, on the grounds of public policy, so to do, it shall be his duty to make an order for the removal of the accused to the most convenient and safe jail of some convenient county. The record shows that such an order was entered by the circuit judge in this case directing the accused to be kept in jail at Louisville, Missis-

sippi. This order was fully authorized by the statute and there was no error in its entry. The present counsel for petitioner complains that his opportunity for conferring with his client was very limited. The record shows however that when that attorney appeared in Vaiden and requested the privilege of conferring with his client, the circuit judge immediately directed that the prisoner be brought to Vaiden and the judge set aside a room in the courthouse where no one was present except the accused and his present attorney, and gave them unlimited time for conference. After that attorney had withdrawn from the case and had returned to Chicago he wrote letters both to the circuit judge and to the district attorney and thanked them for the many courtesies extended to him while he was in Mississippi.

 Petitioner complains that it was not possible for him to file his motion to quash the indictment and his motions raising federal constitutional questions before the return of the indictment. We have repeatedly held that in cases involving federal constitutional questions it is not necessary that such motions be made before the return of the indictment where the accused has been denied reasonable opportunity for doing so, and the circuit judge in this case, in recognition of those decisions, granted the petitioner additional time in which to prepare and file his motions and petitions.

 We come now to the main question relied upon by petitioner, which is the denial of his constitutional right by the systematic exclusion of Negroes from jury service. As heretofore pointed out this question was raised before the United States Supreme Court in the petition for certiorari after the final disposition of this case on the merits by this court. It was not raised in the lower court nor in this court on the appeal on the merits, and it is our view that the raising of the question by petition for writ of error coram nobis at this time comes entirely too late. It should have been raised in the lower court. 50 C. J. S., Juries, Section 263 page 1024

says: "A challenge to the array or a motion to quash the venire should be made at the first opportunity, or as soon as the facts which warrant it are known, or, if the time is regulated by statute it must be filed within the time so limited."

The same text on the same subject in Section 265 at page 1026 says: "It will be presumed, in the absence of evidence to the contrary, that the officers charged with the duty of selecting, drawing, and summoning the jury have acted faithfully and according to law, and the burden of showing the contrary is on the challenging party."

In 1 A. L. R. 2d, beginning at page 1291, there is a lengthly annotation on the subject now before us. In Section 2 of that annotation it is said: "Of course, the mere allegation of discrimination against an eligible class or race as regards selection for jury srevice is not proof in itself of the presence of such discrimination. And the burden of proof to sustain the contention is upon the one making the allegation—usually the defendant."

In Section 3 of the same annotation in 1 A. L. R. 2d, beginning at the bottom of page 1293 and continuing to page 1294, it is said: "Contentions that an eligible class or race has been excluded from the jury in a criminal case, or that it has been discriminated against in that regard, usually are raised by, or on behalf of, the defendant. Mere allegations are not sufficient in and of themselves to sustain such a contention, and the burden of proof to show an alleged discrimination in the selection of the grand or petit jury, or of the jury list or panel, is on the one making the allegation."

To support the statement in this annotation there are cited eight cases from the Supreme Court of the United States together with authorities from sixteen other states as well as the District of Columbia. We repeat that there is no showing whatsoever in the proceeding

now before us or in the record of the original trial that Negroes have been systematically excluded from jury service in Carroll County. The most that can be said is that there are general allegations to that effect in the petition which we now have under consideration, but there is not the slightest proof by affidavit or otherwise to support these conclusions. It necessarily follows, therefore, that the petition for leave to file a writ of error coram nobis must be denied.

 There is an additional prayer to the petition now under consideration that if we should conclude to deny the petition for the filing of the petition in the lower court as provided by said Chapter 250 of the Laws of 1952, that the petition should then be considered by us as a petition for a writ of habeas corpus. Section 2816 of the Mississippi Code of 1942 specifically provides that habeas corpus should not be granted on the petition of any person suffering imprisonment under lawful judgment. From a review of the entire case, including the record of the original trial and what has heretofore been adjudicated by this Court and by the Supreme Court of the United States, we conclude that the petitioner is imprisoned under lawful judgment and that therefore the alternative prayer should be denied.

Chapter 250 of the Laws of 1952, in Section 8, provides that where there has been an automatic stay of execution and the application for a writ of error coram nobis shall be denied, then the tribunal having jurisdiction of such application or petition shall forthwith fix a date, not more than twenty-one days distant, for the execution of the sentence, and that mandate or warrant shall forthwith issue accordingly. Pursuant to the terms of said Section 8, the date of the execution of the death sentence upon petitioner is hereby fixed for Friday, March 23, 1956.

Petition denied and Friday, March 23, 1956, set for date of execution. This proceeding has been considered

by the court in banc and all nine Justices of the Court concur.

## ON MOTION TO SET NEW EXECUTION DATE

January 7, 1957 91 So. 2d 751

ROBERDS, P. J.

Appellant was convicted in the Circuit Court of the Second Judicial District of Carroll County at the November 1954 term thereof of the crime of murder and sentenced to death.

He appealed to this Court, and on March 28, 1955, the judgment and sentence of said circuit court were affirmed and Friday, May 13, 1955, was fixed for the date of the execution, the opinion in said case appearing in 78 So. 2d. 762.

On May 11, 1955, an appeal from the action of this Court was granted to the Supreme Court of the United States, thereby staying the date of execution as fixed by this Court.

On December 12, 1955, the Supreme Court of the United States denied Goldsby's petition for writ of certiorari. 350 U. S. 925, 76 S. Ct. 216, 100 L. Ed. 809. Whereupon, acting upon a motion to set new date for execution, this Court fixed Friday, February 24, 1956, as the date for execution. 84 So. 2d 528.

On February 21, 1956, appellant Goldsby filed in this Court a petition for writ of error coram nobis, which petition was denied March 5, 1956. 86 So. 2d 27. Appellant then prosecuted an appeal to the Supreme Court of the United States and secured a stay of execution pending said appeal. On December 10, 1956, in ʻCause No. 185, Misc., October Term 1956, the Supreme Court of the United States denied the petition for certiorari, as evidenced by a certified copy of an order of the Supreme Court of the United States attached to the motion now under consideration to set a new date for execution. The

State of Mississippi has presented to this Court a motion to have another date fixed for execution of a death sentence of appellant.

The said motion is hereby sustained and Tuesday, February 12, 1957, is hereby set as the date for execution of the appellant Goldsby. All Justices concur.