McLAURIN *v.* STATE.

In Banc. Oct. 11, 1948.

(37 So. (2d) 8)

**W. E. McIntyre, John Burkett,** and **Barnett, Barnett &
Jones,** for appellant.

556

560

George H. Ethridge, Assistant Attorney General, for appellee.

**Roberds, J.**

McLaurin was convicted of the murder of Hertisene Porter and sentenced to death.

On this appeal, he contends (1) that the proof does not sustain a conviction of any crime, but, if so, no greater crime than manslaughter; (2) that the trial judge erred in granting to the State, and in his refusal to grant to him, the instructions hereinafter discussed; and (3) in admitting in evidence in behalf of the State certain rebuttal testimony.

The first contention requires a brief summary of the evidence. The incident took place on Sunday morning, March 3, 1947, around one-thirty to two o'clock, in a cafe operated by one James Howard Carr in the western part of Rankin County. There were a number of parties present. The testimony of James Holden as to what happened is illustrative of that offered by the State. He said:

"A. Well that night we all went over there, we left the Green Lantern and went over there to the place, me, Hertisene and Woodworth and another boy, and we all got in the place and he goes in first and I goes in behind him and he started ordering the Coca Colas, first one thing and another, and James Howard asked him, says 'are you ready to pay up the bill'' and he seemed not to hear it and Hertisene repeated it and he said to me 'You get back' and I stepped back and he hauled off and shot me, then turned around and shot her.

"Q. Who was it said something about paying the bill? A. James Howard Carr.

"Q. What did she say to Woodworth? A. She repeated him.

"Q. What was it he said if anything? A. He said 'Step back.'

"Q. Well did he say he was going to pay the bill? A. He said he was going to settle for the whole bill.

"Q. All right, then what did he do? A. He hauled off and shot me.

"Q. Where did he shoot you? A. In my arm.

"Q. Have you got a scar there on your arm? A. Yes, sir.

"Q. What else did he do? A. Then he turned and shot her just as she went out of the door, then he come on out of the house and shot this other fellow.'' Objection was sustained to evidence that appellant shot "this other fellow."

The witness further said that the Porter woman ran from the building into the front yard and shortly expired. On cross examination he said "Well when James Howard asked him to pay the bill or was he ready to pay the bill, she repeated it, he seemed to didn't hear it and she repeated it to him, he stepped back and said 'I will pay all the bills' ''; that appellant "pushed me back" and shot the witness, and then shot Hertisene Porter as she ran from the building. Four other eyewitnesses for the State substantiated the testimony of this witness, all

saying that Hertisene Porter had no weapon, was engaged in no overt act whatever towards appellant, but, on the other hand, was running away from him. The victim was shot in the back, a little to the left side.

The proof of the State further shows that appellant was overcome and the pistol taken from him. One witness said "I held his arms down and told a girl to take the pistol and she put her foot on his arm and twisted the pistol out of his hand." This pistol was delivered to the sheriff of the county and was introduced in evidence at the trial. It was described as a "Police Special 38 Colt's."

The defense introduced only two witnesses, the embalmer and himself. The embalmer said the bullet entered the back of the left side of the victim, under the ribs, and ranged upward and lodged under the skin in the front of the body.

McLaurin testified that he was working at the Green Lantern, a cafe, located, it appears, next to, or near, Carr's place; that Hertisene Porter came to the Green Lantern prior to this tragedy, and there was some discussion between them about his paying for drinks, and someone by the name of Blue repaying him money. It is not clear from his testimony just what he meant. In any event, Hertisene went over to Carr's place and he says he followed. We give in his words what he said then happened:

"A. And she speaks out in front of the crowd, he was in this crowd, she told me to go on in and she would be in shortly, so I walked in and when I went in there was a crowd come in there with her, well they was in there and they said 'Here is a Green Lantern man over here. We have spent a lot of money over there, let's make him buy us a drink.' I reached over to James Howard and asked him what did he have and he said a half pint of Blacklabel, 'I will let you have it for $1.25.' So I told him to set it up, so I slapped the money up there so some of them says there is too many of us here for a half pint,

buy a fifth. I told them I didn't have the money and they just kept on and the dead girl hadn't said anything. So presently she walked up and says 'Why don't you buy a fifth?' so I says 'When Blue comes and gives me my money I will have enough.' She felt of this pocket I had in it a few nickles and quarters, she felt them and I held that hand so she said there is some more and I pushed that hand back so she looked up at me and says 'You are a cheap son-of-a-bitch.'

"Q. Let's pick that up about the money, that is the money had. How did you come to have all that? A. That is the money I had making change at the slot machine.

"Q. Would they count a certain amount of money to you and then you would have to turn in a certain amount of money when you checked out? A. Yes, sir.

"Q. This was money that belonged to the Green Lantern, is that right? A. Yes, sir.

"Q. All right, go on? A. When she said that she turned around and when she turned around somebody shoved me into her.

"Q. Do you know who that was that shoved you into her? A. I don't know who it was, so when they shoved me into her, she turned around and reached into her bosom, and I thought maybe she was going to get a knife, but she had a gun, and as I reached for the gun, I was hit back here on my shoulder, and I like to have dropped the gun; and then I was hit in the back of the head and everything just went dark.

"Q. Is that all you remember that happened that night? A. Yes, sir.

"Q. Do you know who did hit you? A. No, sir.

"Q. Do you know who pushed you? A. No, sir.

"Q. Do you know any man who was standing there and fired it? A. No, sir.

"Q. Did you have any gun that night on your person when you went in there? A. No, sir.

"Q. Did you have any gun at all on your person that night? A. No, sir."

The officer arrested him between four and five o'clock that morning in bed at the Green Lantern. He says he does not remember anything that happened from the time everything "went dark" until he was arrested.

Now, in that state of the proof the jurors, of course, had the right to believe the evidence of the several witnesses for the State in preference to the lone testimony of the defendant. Indeed, we are unable to understand how any jury could have decided otherwise. Having so decided the facts, appellant, angry at the time, and using a dealy weapon, purposely and designedly, shot his victim in the back when she was running from him, and, naturally, when she was making no hostile demonstration towards him, and when, according to the undisputed proof, she had no weapon, deadly or otherwise, on her person.

Section 2215, Code 1942, defines murder as: "The killing of a human being, without the authority of law, by any means or in any manner, shall be murder in the following cases:

"(a) When done with deliberate design to effect the death of the person killed, or of any human being;

"(b) When done in the commission of an act eminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual."

No discussion, or citation of authority, is needed to demonstrate that under the evidence of the State, accepted by the jury, appellant was guilty of deliberate murder.

But the main argument of appellant is that he could not be guilty of a greater crime than manslaughter because of the epithet, according to his testimony given above, applied to him by Hertisene Porter. In the first place, the jury had the right to disbelieve she used any such epithet. The entire story of appellant is far-fetched

and rather unreasonable. In addition, while the State's witnesses did not specifically deny the epithet was used, their testimony negatives any such statement by Hertisene Porter. And, finally, this Court has held that mere words of reproach, however grievous or provoking, are ". . . not sufficient to reduce to manslaughter what otherwise is murder." Williams v. State, 199 Miss. 585, 26 So. (2d) 174; Richardson v. State, 123 Miss. 232, 85 So. 186. The State itself, by appropriate instructions, submitted to the jury for decision, in case it found appellant guilty of any crime, whether he was guilty of murder or manslaughter. It found him guilty of murder, and the evidence, on the merits of this question, amply justified the finding.

 Defendant requested, and refused, what is known as the falsus in uno, falsus in omnibus instruction. The court was correct in so doing. That instruction has been condemned by this Court. Wood v. State, 174 Miss. 499, 165 So. 123.

 The trial court granted the State this instruction: "The Court instructs the Jury for the State, that while it is true in this case as in all criminal cases, that the defendant is presumed to be innocent until proven guilty, and that this presumption of innocence goes with the defendant throughout the entire trial, until overcome by competent testimony and that while it is further true that the burden of proof in this case as in all criminal cases, is upon the State to satisfy the minds of the Jury, of the guilt of the defendant from the evidence, beyond reasonable doubt, yet the Court now says to you, that this presumption of innocence which the law throws around the defendant as a shield and safeguard, is not intended to shield from punishment anyone who is in fact guilty, but is simply a provision of the law to guard against the conviction of any innocent person, and the Court further says to you, that if you believe from all the evidence in this case, beyond a reasonable hypothesis, that the defendant is guilty as charged in the indictment, then it is

your sworn duty to, 'Guilty' by your verdict, regardless of the presumption of innocence and the further fact that the burden of proof is upon the State.'' This, in substance, is the same instruction given in Smith v. State, 161 Miss. 430, 137 So. 96. This Court there said the instruction embodies correct legal principles, but that it is complicated and might confuse the jury; that ''The instruction is too smart.'' However, while not commending the instruction, the Court held it was not error to give it. We might add that in the case at bar the record discloses that the trial judge first granted to the State that instruction, but when he heard it read to the jury by the prosecuting attorney, he was doubtful of the advisability of giving it, and he then withdrew it, and the jurors did not have it before them in their deliberations. In addition, the defendant was granted eight instructions submitting to the jury his contention of non-guilt and the legal principles on which he based his contention. No error is here shown.

The last contention of appellant is that the court erred in admitting certain testimony of one John White in rebuttal, after appellant had testified in the case. That came about in this manner: Appellant had testified, as will be seen from his evidence above, that he did not have a pistol, and he did not shoot anyone, but that he was hit on the head and became unconscious and did not know what happened thereafter. The witness White was a constable, and he arrested appellant while appellant was in bed at the Green Lantern between four and five o'clock in the morning. The witness White was asked if he told appellant, when he apprehended him, that he was under arrest. He said he did. He was asked what McLaurin said, and replied that McLaurin asked ''For what?'' and that he then told him he was being arrested for shooting ''that negro woman.'' The trial judge, in response to objection to this testimony, said this evidence was admitted only for the purpose of contradicting the statement of McLaurin that after he claims to

have been struck on the head during this melee that he had a complete lapse of memory, and did not know what happened thereafter. It did have bearing upon that question of fact and its admission was not error.

Affirmed, and Friday, November 26, 1948, is set for the date of execution.