GADDIS *v.* STATE.

In Banc. Nov. 14, 1949.

No. 37296 (42 So. (2d) 724)

Brown & Elledge, and Cunningham & Cunningham, for appellant.

**George H. Ethridge**, Assistant Attorney General, for appellee.

**Montgomery, J.**

Appellant was convicted in the Circuit Court of Itawamba County on an indictment charging him with the murder of one Noonan Lentz, was sentenced to life imprisonment in the state penitentiary, and appeals here.

The facts in the case are practically without dispute. The appellant and his wife had been having some family difficulties, the nature of which do not appear from this record, and on Monday night, previous to the killing on the following Thursday, July 1, 1948, Gaddis' wife came to the home of the deceased and his wife and remained there until about sundown on the afternoon of Thursday, July 1st, at which time, the appellant came after her. Mrs. Gaddis was on the porch and Gaddis caught her by the hair with his left hand, while brandishing a pistol in his right hand and led her away by force to his own home. Apparently Mrs. Gaddis escaped in some way not shown in the record, for after a lapse of some 30 or 40 minutes, Gaddis came back to the Lentz home and asked Noonan Lentz if she was there and Lentz told him she wasn't, and that he, Lentz, didn't want him, Gaddis, to come there any more. Gaddis was mad and invited Lentz out into the road, but Lentz refused to go and told Gaddis to go on home and put up his gun and that he, Gaddis, was mad and that he, Lentz, would talk with him the next morning. Gaddis didn't say anything more and went back down to the road and started toward his home. Noonan Lentz took a seat in a chair on the front porch and Mrs. Lentz remained on the porch also. Then night came. About 30 minutes after Gaddis had left, Mrs. Lentz heard a noise in the road like some one walking from the direction of the Gaddis home. She looked out and saw the bulk of a small man about the size of Truman Gaddis. About that time a car passed and the lights fell on this figure and Mrs. Lentz recognized the figure to be Truman Gaddis. Mrs. Lentz testified Gaddis was "hunkered" or crouched down on the opposite side of the road from the Lentz mail box. Noonan Lentz was seated on the porch in a straight chair leaning back against the corner of the house where the porch made a turn. Gaddis was to the right of the mail box on the opposite side of the road. Lentz lit a cigarette just before the car passed and in a few seconds after the car

passed there was a shot that came from the direction of the road. This occurred at about 8:30 P.M. on Thursday, July 1, 1948. The bullet struck Lentz in the left arm, about two inches below the shoulder and entered the chest, passing through both lungs and the upper part of the heart and lodging against the ninth rib on the right side, shattering a part of the rib. Lentz got up, stepped off the porch and fell. In 15 minutes he was dead. Dillard Reeves, Perry Hargett, Cortez Lentz and Rex Barrett, neighbors, on hearing the shot started toward the scene and found Truman Gaddis in the road about 75 yards from the Lentz mail box with a pistol in his right hand. Gaddis handed his gun to Hargett without protest. None of the witnesses last mentioned saw anything to indicate Gaddis was drunk. Cortez Lentz asked Gaddis: "What's the matter, what happened, have you shot Noonan?", and Gaddis replied "I don't know, you go and see". At about daylight the next morning, Roy Holly and Sam Mayhall found an empty cartridge case or shell in the ditch nearly straight across the road from the Lentz mail box. This gun and empty shell were turned over to the F. B. I. along with the bullet removed from Noonan Lentz's body and the empty shell was identified by George Berley, ballistics expert of the F. B. I. as having been fired in the Gaddis pistol. The bullet was compared with test bullets fired from the Gaddis gun and the rifling characteristics were found similar but due to mutilation of the bullet it was not sufficient to permit adequate comparison to be made.

Gaddis' defense was that he had been drinking beer, gin and whiskey since noon and the last thing he remembers was his drinking beer at the house of one Coot Horn. The next thing he remembered was the next morning when he awoke in the Fulton jail with a hangover. He testified that he didn't know whether he went to the Noonan Lentz house or what he did. Several witnesses testified for the defendant that they saw him that afternoon and some say he was drinking and others

say he was drunk. Numerous witnesses testified for the state that Gaddis was not drunk, though some admitted he had been drinking. On this theory the appellant obtained two instructions, numbered 4 and 5 and reading as follows:

"No. 4. The Court charges the jury for the defendant that even though you should find from the evidence that the defendant shot and killed Lentz, yet the court further charges you that if you find from the evidence that the defendant was so drunk, coupled with his domestic trouble, on the occasion when Noonan Lentz came to his death that he had lost the power to reason and to form an intent, then you cannot find the defendant guilty of murder."

"No. 5. The Court charges the jury for the defendant that even though you may believe from the evidence to a moral certainty and beyond all reasonable doubt that this defendant shot and killed Noonan Lentz, yet the court further charges you for the defendant that before you can convict the defendant of murder the evidence must convince your minds beyond all reasonable doubt and to a moral certainty that the defendant was in such a mental condition of sobriety at the very instant of the shooting as to enable him to premeditate and deliberately form the specific intent to unlawfully, feloniously, and of his malice aforethought to kill and murder Noonan Lentz."

Gaddis further defended on the ground that on the occasion of the killing he was intoxicated and his intoxication in connection with his domestic trouble put him in a wild and excited state of mind so that he shot his gun recklessly and that his shot unintentionally struck Lentz and killed him at a time when defendant had no deliberate design to effect his death. On this theory he obtained from the court an instruction reading as follows: "The court charges the jury for the defendant that even though you should believe that at the time and on the occasion of this killing that this defendant became

and was intoxicated and that his intoxication with his domestic trouble put him in a wild and an excited state of mind so that he shot his gun recklessly and that his shot unintentionally struck Lentz and killed him at a time when defendant had no deliberate design to effect his death, then the court says to you that you cannot find him guilty of murder but under such a state of facts the jury would be warranted only, if it so believed from the evidence beyond a reasonable doubt, in finding him guilty of manslaughter, and in that event, the form of your verdict should be: 'We, the jury, find the defendant guilty of manslaughter.' "

The jury found the appellant guilty as charged but were unable to agree on the punishment and accordingly he was given a life sentence.

The appellant has assigned some fourteen grounds of error. We find no merit in any of them and therefore consider it unnecessary to set them out in this opinion.

 The fact, if it be a fact, that appellant was very much provoked over his domestic difficulties with his wife, so much so that he had caught her by the hair with his left hand while brandishing a pistol in his right hand and led her to his home; the fact, if it be a fact, that he was intoxicated; the fact, if it be a fact, that he resented the interference by Lentz in his family row, all of these, neither singly nor collectively, were sufficient to reduce his crime from murder to manslaughter. In manslaughter the malice or intent to kill must arise from a present provocation and this provocation must stem from the deceased. Lentz was not responsible for the fact that appellant was mad at his wife, and the mere fact that appellant was mad is in no sense a justification for an outrageous murder of a third person. Words of reproach, criticism or anger do not constitute sufficient provocation to reduce an intentional and unjustifiable homicide from murder to manslaughter. Richardson v. State, 123 Miss. 232, 85 So. 186; Williams v.

State, Miss., 26 So. (2d) 174; McLaurin v. State, 205 Miss. 554, 37 So. (2d) 8.

■ ■■■ The only element of manslaughter in this case is based on Section 2232 of the 1942 Code, which reads as follows: "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this chapter, shall be manslaughter." Appellant's rights under this Code Section were submitted to the jury under a proper instruction and the jury found against appellant. The jury found that Noonan Lentz was murdered as charged in the indictment and that he did not come to his death as a result of the culpable negligence of the appellant in firing the fatal shot without intent to effect his death.

■■■ Regarding the alleged error in overruling the motion for a change of venue, the rule is announced in Keeton v. State, 132 Miss. 732, 96 So. 179, 180, as follows:

"Section 1484, Code of 1906 (Section 1242, Hemingway's Code), provides:

"When 'by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case, to a convenient county, upon such terms, as to the costs in the case, as may be proper.'

"Under this section it is not necessary, in order for a defendant to be entitled to a change of venue, that it shall appear that every otherwise qualified juror in the county where the offense is charged to have been committed has prejudged the defendant's case or bears a grudge or ill will against him, and the defendant should not be denied a change of venue, although it may appear that 12 unbiased men may be found in the county to try him. The statute contemplates that the jury shall not only be composed of unbiased and impartial men, but

of men who have not been and will not during the trial be subject to the influence of a popular demand for the defendant's conviction. If such a demand is widespread before the trial and is evidenced by the conduct of a large crowd at the trial, it can be safely assumed that the jury will not be uninfluenced thereby.''

In Magness v. State, 103 Miss. 30, 60 So. 8, 10, this court said: ''The requirement of the law is not satisfied by the mere impaneling of 12 men against whom no legal complaint can be made. The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially, and uninfluenced by a preponderant sentiment that he should be flung to the lions.''

A special venire of 75 names was ordered. Three of the veniremen were not summoned. Of the remaining 72, some 37 were excused for one cause or another by the court. Twelve were challenged peremptorily by the defendant and three by the state. When the jury was completed there were still some 20 veniremen who had not been called. On the hearing of the motion for a change of venue appellant introduced some 14 witnesses who testified there was prejudice in the public mind against the appellant and that appellant could not obtain a fair trial in the county, but opposed to this some 20 witnesses testified for the state. Among these witnesses were the sheriff, members of the Board of Supervisors, merchants, farmers, a teacher, a milk hauler and a parts manager at the Chevrolet place, all of whom were shown to be in position to feel the public pulse and all of whom testified there was no prejudgment of the case in the public mind, that there was no prejudice against appellant in the public mind and that in their judgment appellant could get a fair trial in Itawamba County.

After a careful review of the whole record of the trial below we are satisfied that a fair proportion of the people qualified for jury service in Itawamba County were

qualified to try appellant's case fairly and impartially and that there was no preponderant sentiment in the county against him and we are convinced that the jury tried appellant's case in an atmosphere uninfluenced by any preponderant public sentiment against him and that there was no such sentiment prevailing against him in the county. The court correctly overruled the motion for a change of venue.

Looking at the trial from every angle and as a completed trial, all the evidence points to the fact that the appellant received a fair trial and was justly convicted of the crime for which he is charged. No right affecting fundamentally the rights of the appellant were denied him and the whole evidence supports the verdict of the jury and justifies the jury's belief beyond every reasonable doubt of defendant's guilt.

The judgment of the lower court will be affirmed.

Affirmed.