GILMORE *v.* STATE

No. 39872      October 24, 1955      82 So. 2d 838

*Sims, Sims & Sims,* Columbus, for appellant.

*Wm. E. Cresswell, Asst. Atty. Gen.,* Jackson, for appellee.

LEE, J.

At the March 1955 Term of the Circuit Court of Monroe County, Murry Garfield Gilmore was found guilty of the murder of Sam C. Addington, and was sentenced to death in the State's lethal chamber. From the judgment entered he appealed.

Addington's store burned down on November 16, 1954, and the murder investigation began immediately. Gilmore was arrested several days later; and was thereafter confined in the county jail from November 23 until the date of the trial. An indictment was returned on

March 14, 1955, at which time the defendant was arraigned, with counsel of his own choice present. A plea of not guilty was entered. When the case was called for setting on March 21, the defendant filed an application for continuance, to which was attached the affidavit of W. L. Sims, a member of the firm of Sims and Sims of Columbus, Mississippi. On the same date he also filed an application for a change of venue, which was accompanied by the affidavits of two affiants, as provided by statute.

The substance of the application for continuance was that the defendant and his people were poor, and his attorneys were not employed until the date of arraignment; that he had not had an opportunity to advise with his attorneys or conduct an investigation; that under prevailing conditions of hostility, he could not obtain a fair trial; and that the cause should be continued until the next regular term of court in order that justice might be done. The affidavit of W. L. Sims averred that he was a member, and had been attending sessions, of the legislature for the past ten weeks. There was no showing that the attorneys, either prior or subsequent to arraignment, were deprived of the right to confer and advise with their client. The defendant was then in the county jail, and his people had been visiting him at any and all times. The application was overruled.

The application for a change of venue was then heard. The State called Earl Chism, a nephew of the defendant by marriage, one of the affiants, for cross examination. While stating that "everybody talks agin the boy", he was able to give the name of only one person who had expressed the opinion that the defendant could not obtain a fair trial. In opposition to the motion, the State put on the stand Joe T. Morgan, ex-chancery clerk and sheriff, Frank Whitaker, a farmer, W. W. Wamble, retired, T. A. Richardson, an automobile salesman, R. A. Pullen, supervisor and ex-chancery clerk, T. L. Word, a farmer, Frank Wiygul, a highway patrolman, Russell

Smith, another highway patrolman, Leroy Bourland, sheriff and ex-chancery clerk, Nathan Logan, marshal of Smithville, Pearl Jackson, in the telephone business, E. C. Bourland, a banker, John Miller, who operated a bulldozer over the county, Frank Durrett, a postmaster and sawmill and store operator, Houston Blair, a farmer, Jimmie Camp, a grocer, A. C. Moore, retired, and James Cockerham, a supervisor, — eighteen witnesses of varied occupations, and wide acquaintance over the county — each of whom expressed the opinion that the defendant would get a fair trial in the county. It was shown that there was no prejudice or bias or ill-will against the defendant; that, while articles about the killing appeared in the two newspapers, the people were content to await the development of the facts; that the talk was no different than that which occurred in the average murder case; and that for the past thirty or sixty days, there had been practically no comment about the case.

In rebuttal, the defendant called Roy Steinfort, editor of the Aberdeen Examiner, and Theron Harden, editor of the Amory News Advertiser, by whom he introduced in evidence several issues of those papers which contained news items about the deaths of Mr. and Mrs. Addington, and who testified that their respective circulations were about 3,000 and 2,500. Both of these witnesses, on cross examination, also expressed the opinion that the defendant would get a fair trial in the county. The application for the change of venue was denied.

On March 22, the defendant's motion for a special venire was sustained, and 125 names were drawn, returnable March 25, the date set for the trial on its merits. On that date, counsel for the defendant dictated into the record a supplemental motion for a continuance, in which it was stated that, because of the washout of a bridge, his counsel was unable to contact relatives of the defendant to get a list of witnesses, and that one member of the firm of attorneys, a Lieutenant Colonel in the National Guard, had been called into emergency service;

and that for these reasons the case should be continued. No proof was offered on this motion, and it was overruled.

A jury to try the cause on its merits was then selected and impaneled on that date. But, before the taking of testimony began, the attorneys for the defendant filed a suggestion of present insanity of the defendant, and asked for the privilege of submitting proof that the defendant was not then capable of making a rational defense.

A separate jury was then impaneled to try the issue of present sanity. The defendant offered Dr. R. T. Dabbs, who had attended the defendant one night in the jail. However the doctor found, from his examination, that the prisoner's blood pressure, pulse, temperature and hearing were good; that he was "just disgusted with everything", but that he was mentally normal. It was his opinion that the defendant was then, and still is, sane. Albert Smith, who had been a prisoner in the jail for a month, testified that the defendant walked the floor and beat a pan one night; that he laughed, sang, cried and talked about his mother; and that there was something wrong with him. But, on cross-examination, he admitted that he would not say that the defendant was crazy. Robert Lee Petty, another prisoner and ex-convict, testified too about the same facts as Albert Smith; and that he complained of his head hurting, but he refused to express an opinion about the defendant's sanity or insanity. J. A. Parrish, another prisoner, testified that the defendant acted all right until he fell out one night, and mentioned about the beating of the bucket and his complaint about his head. But finally, on cross-examination, the witness, in answer to a question as to whether or not the man was crazy, said "I think he is all right myself." Opal Gilmore, a brother of the defendant, testified that the accused suffered with his head and has not seemed right for about five months. Luther Sims, one of his attorneys, testified that the defendant

at times talked to him, but at others would talk about something else; and that he was unable to get a sensible conversation that would aid in the defense. He stated however that "I don't say crazy, he is not normal."

The State called Shelby Monaghan, a deputy sheriff, who had known the defendant for three or four years and who talked to him frequently since his incarceration in jail. This witness testified that Gilmore talked sensibly and was absolutely sane. Leroy Bourland, in the jail two or three times a week, had observed and talked to the defendant and was of the opinion that he was sane. Dr. W. F. Cresswell, who had, in addition to his general training and experience, also experience with mental patients at Walter Reed and another hospital, saw the defendant twice. He found him emotionally upset and nervous, but he talked rationally, had no hallucinations or any type of mental depressive psychosis or schizophrenia; and it was the opinion of the doctor that Gilmore was sane. Armon Howell, the jailer, observed him from two to four times daily, stayed around him about an hour the night before, and was of the opinion that he was sane.

The jury found the defendant sufficiently sane at that time to conduct a rational defense to the charge of murder. The suggestion of present insanity was thereupon overruled by the court on November 26; and the jury, which had been impaneled to try the cause on the merits, and which had been withdrawn from the courtroom in charge of bailiffs, was continued in charge of such bailiffs until the following Monday, March 28, when the trial on that issue proceeded.

Sam Addington operated a rural mercantile business in Monroe County several miles from the line between Mississippi and Alabama. He and his wife, 75 and 77 years of age respectively, also had living quarters in the same building. Buell Noe, a neighbor, visited with them on the evening of November 16, 1954, leaving the store about 7:20 o'clock. James B. Aldridge drove by the store about 6 o'clock, going to a religious meeting.

On his return, about 8:30 or 9:00 o'clock, he observed that the store was on fire. He rushed to the front door and opened it, at the time, seeing a bulk like a person, lying on the floor near the refrigerator; but the flames were so intense that he could not go inside. He spread the alarm and many people came, but they were helpless to enter the building.

Mr. Addington wore eye-glasses and suspenders. Because of a hernia, he also wore a truss. He habitually carried a pocketknife, keys, and a billfold, which was laced with a chain. When the fire had cooled sufficiently to permit an examination, Frank Wiygul, a patrolman, found the remains of a body near the refrigerator, in the exact spot where James B. Aldridge had seen the bulk which he took to be a person. On and under the body, he found a pair of eye-glasses and case, a pocket-knife, snaps from suspenders, a chain from a billfold, a ring of keys, and a steel rod, such as is found in trusses, around the body; and about 18 inches away, the head of a hammer and a can which had contained cigarette lighter fuel. These articles were identified as belonging to Sam Addington. Another body, presumably that of Mrs. Addington, burned beyond recognition, was found several feet away. These supposed remains of Sam Addington were delivered to Dr. W. P. Featherstone, a pathologist at Jackson, Mississippi. He performed a limited autopsy and found that the lungs and air passages were devoid of smoke or carbon; and that the brain was soft as if squeezed through rents in the skull. It was his opinion that a blow, or blows, on the head caused the rents in the skull; that such blow or blows caused death; and that death had occurred before the fire.

The defendant was shown to have been in the vicinity of the crime that day. Luther Pyron, a mail carrier, testified that the defendant rode with him from near his home to the Northington store. A man claiming that his name was Jackson, went to the home of Mr. and Mrs. A. L. Stanford, about three-fourths of a mile from the

state line, at 12:40 A.M., after the fire, and tried to get Stanford to carry him to Hamilton, Alabama. Between 1:00 and 1:30 o'clock, after the fire, a man, claiming to be named Jackson, but actually the defendant, appeared at the home of Lester Brown, farther down the road from the Stanford home, and engaged him to drive him to Hamilton, Alabama. At the time the defendant wore blue jeans and a brown jacket, and paid $2.00 for the trip. The defendant appeared at the home of Mrs. Opal Ballard, just outside of Hamilton, Alabama, about 3:15 A.M., wearing blue jeans and a jacket. He then paid Mrs. Mary Lee Foster $80.00 that he owed her, changed clothes and put the worn clothes in a foot locker to be laundered by her. Just before he left her house at 6:30 A.M., going toward town, Opal asked where he was going, and he replied, ''Well, I guess I will have to go somewhere I have never been before.'' Neither she nor Mrs. Foster noticed anything out of the ordinary with him, though he sometimes suffered from headaches. Edna Grace Ballard, a young daughter of Mrs. Opal Ballard, was present at the time. She testified that the defendant gave her $12.00 and she met him about 8:00 o'clock that morning at the taxi stand at Hamilton, and they went by bus to Fayette, and thence to Tuscaloosa, where they registered in the Burchfield Hotel as Mr. and Mrs. Carl Johnson. In the hotel room, they counted his money. There were 101 $1.00 bills and other currency in larger denominations. He had in all at that time, after having made a number of expenditures, about $300.00. The couple were on their way by bus to Zephyr Hills, Florida, but were arrested and taken off of the bus before reaching that point at Perry, Florida. The bus drivers from Hamilton to Fayette, and from Fayette to Tuscaloosa, identified the defendant and his companion and testified that he paid the fares.

The foot locker in which the defendant placed the clothes which he wore on the night of the fire, was delivered to the officers and they in turn transmitted the

clothes to the office of the Federal Bureau of Investigation at Washington, D. C. P. R. Bidez, a special agent, examined the clothes and testified that the stains on the shirt and trousers were human blood. These clothes were introduced in evidence and were substantially identified by Opal and Edna Grace Ballard as the clothes which the defendant was wearing when he came to their home, and which he placed in the foot locker. The officers found a flashlight a short distance northwest of the Ballard home, which was just like a dozen of such articles which a traveling salesman had sold Sam Addington about a month before. The officers also noticed, after the defendant's arrest, that his hair on the right front side was singed or burned.

The State offered in evidence three written statements which were shown to have been given and signed by the defendant. One was dated November 21, 1954, and the other two were dated November 23, thereafter. Preliminary examinations as to competency and admissibility were held by the trial judge outside the presence of the jury. The witnesses to these statements testified that they were made freely and voluntarily, without threats or coercion, without promises of any kind, and after warning that they would be used against the defendant. The defendant, in this hearing, did not claim that they were not freely made or that they were extorted. He simply denied that he made them at all; but, if he did make them, he had no recollection of doing so. The November 21 statement went into detail as to the defendant's movements on November 16, his going to the home of Mrs. Opal Ballard, changing clothes at that place, and his trip with Edna Grace Ballard from Hamilton to Fayette, thence to Tuscaloosa, and their arrest at Perry, Florida; but it in no way incriminated him in the killing.

The first statement which he gave on November 23 related some facts in connection with his personal history; that he was 31 years old, etc.; that he quit work

that day because it was raining, and caught a ride with a mail carrier for some distance; and that he finally traveled the road to Sam Addington's store, and along this road, watched some squirrels play for about an hour or more. Continuing, it said:

"While walking down this old ridge road I stopped for about a hour or hour and half and watched two squirrels play.

"I reached Mr. Sam Addington's Store about Eight or 8:30 PM. I could see a light on in the store. I went to Mr. Addington's store to try to borrow $200.00 which I needed badly. The front door of the store was standing open and I walked inside. I bought a Coca Cola and a Standback or a BC, I do not remember which. Uncle Sam waited on me. I gave him a half dollar and he gave me back thirty-five cents. I then bought a can of lighter fluid and a flash light which cost $1.15. I then set down and Uncle Sam Addington filled my lighter for me. At this time Aunt Dena Addington was sitting in front of the heater this making her on my left and Uncle Sam on my right. I then asked Uncle Sam to loan me $200.00 and he said he did not have it. I told him that I knew that he did have it and that I would just get it. I then grabbed a long bill fold that Uncle Sam had in his left hip pocket but it was fastened to his belt and I failed to jerk it loose from him. He then got up with a claw hammer and swung at me but did not hit me and I wrung the hammer out of his hand and hit him with it and knocked him backward but did not knock him down. About that time Aunt Dena said 'Dam you' and started on me with something in her hand. I do not know what it was she had in her hand. I then hit Aunt Dena with the hammer and knocked her down in front of the ice cream box. I only hit her the one time. By that time Uncle Sam was coming on me with a knife and I hit him again with the hammer on the head and knocked him down. After knocking him down I reached down and took all the paper money I saw in the long bill fold which

I later counted and found was $430.00. I did not take any checks. By this time Uncle Sam was getting up and trying to reach his rifle which was beside the refrigerator. I hit him on the head again with this claw hammer and he fell in of the refrigerator. I turned and taken my can of lighter fluid and poured it on the floor, paper and other stuff and struck a match and threw in it. I went out the door and after getting on the outside I decided I would try to get them out of there to keep them from burning up. They were both still lying on the floor. At this time there was something in the bottles on the floor near the wall that started busting and the flame almost hit me in the face. I then ran out the door and slammed the door closed. As I ran out the door I fell down and a big spotted dog that I think belonged to Uncle Sam tried to bite me. I jumped up and ran up the path by the dog house to the road back of the store. I could see the fire flames and kept walking down the road. I walked all the way to a man's house just the other side of Deck Real's store and hired this man for $2.00 to take me to Hamilton, Ala. This man let me out of his car in front of the hotel and I walked from there to the home of Clyde Ballard where I had been staying part of the time. I changed clothes and polished my shoes there. I gave Mary Lee Foster $80.00 to pay her for money I had borrowed from her before. At the time I was at Uncle Sam's store I was wearing blue jean pants and a colored sport shirt. I think the sport shirt was a light green but am not sure just what color it was. After changing clothes I left them there at Ballards house. Sometime before daylight I took the flashlight that I bought from Uncle Sam and hid it on the hill in front of Clyde Ballards house.

"I left Ballards house about 7:00 AM after Grace Ballard told me that she would meet me at the Taxi stand in Hamilton. About 10 minutes before 8:00 AM Grace came to the Taxi stand and we took a taxi to Fayette, Ala. I think that I paid him $7.00 for this trip. I

then hired us another taxi to take us to Tuscaloosa, Ala. I paid $10.00 for this trip. Grace and I spent the night in a hotel at Tuscaloosa using the name of Mr. and Mrs. Carl Johnson of Hamilton, Ala. At Tuscaloosa Grace and I bought some clothes and two suit cases also some jewelry. We then bought bus tickets to Zypher Hills, Fla. Just before reaching Perry, Fla. the bus was stopped by Florida officers and I was arrested there.''

The pertinent and inculpatory part of the second statement on November 23 was as follows:

''I stopped on the way and watched some squirrels playing in the trees about an hour or two. I got to the store about eight or eight-thirty o'clock and went in. After I got in the store and had the trouble and hit them with the hammer and set the fire, I left walking. I went by the dog house up through a path and struck the road leading around by Archie Land's house. I stopped and got a man I did not know to carry me to Hamilton, Alabama, where I went to Mr. Ballard's house. I left there the next morning with Grace Ballard and was on our way to Zepher Hill, Florida, when I was arrested by the Florida State Troopers and the Sheriff of Perry, Florida. I gave a detailed statement of how this all occurred at Addington's store to other officers.

''I have just been shown a pair of blue denim trousers and a light blue sport shirt and they are the clothes I was wearing at Addington's store that night. The shoes I now have on are the shoes I wore the night Mr. and Mrs. Addington were killed. I have been shown two claw hammers which look like the hammer I used. I could not say for sure they are the hammers as they have been burned since I saw them. I am willing to let the officers have the shoes or any of my clothes as evidence.''

When the State rested its case, the defendant called several of the officers for further cross-examination. He then offered J. C. Parrish, Albert Smith, Robert Lee Petty and Dr. R. T. Dabbs on the question of his sanity. Their evidence at this time was substantially the same

as that which they gave on the sanity trial, as hereinbefore mentioned. The defendant, testifying for himself, denied that he committed the crime or that he was in the community that night, and denied that he had given any statement or confession. He then qualified his denial by saying, that if he did, he did not remember anything about it. He testified that when he got to a store at Sulligent, he drank two Coca Colas and took a package of Standbacks, and that he did not know anything until the next morning when he came to himself near Dick Real's store, standing on the bridge, and that from 2:00 P.M. of November 16 until 2 A.M. of the 17th he remembered nothing. He admitted that he got someone to carry him to the Ballard home, for which he thought he paid $2.00. He remembered arriving at Mrs. Ballard's and waking up Mary Lee Foster and paying her some money. But he did not remember the time nor where he got the money. He thought he polished his shoes. He was wearing blue jeans and a maroon jacket. He thought the jacket and blue jeans which had been introduced in evidence and sent to the Bureau of Investigation were his. He was pretty sure that he placed them in a foot locker. He hid the searchlight, which the officers found, before he went into the house, because he did not want to leave it there. The details of his trip with Edna Grace Ballard were inquired into. Some of them he remembered. Others he would not say were wrong. He was willing to take the girl's word for them. He admitted that he could not see any difference between the signature which he wrote in court and the signatures which appeared on his statements.

In rebuttal the State offered G. C. Collier, who had known the defendant all of his life and who had lived on his place two years. This witness testified that in his opinion the defendant had never been insane, and was then sane. Armon Howell, the jailer, and Dr. W. F. Cresswell testified that the defendant was sane. Their

testimony, in effect, was the same as given by them in the trial of the issue of present sanity.

The appellant assigns and argues here four errors, namely, (1) that the court erred in refusing to grant a change of venue; (2) in admitting the confessions of the defendant, because the corpus delicti had not been proved; (3) in refusing to grant him a directed verdict of not guilty; and (4) in denying him a continuance.

██ █ As to the first proposition, twenty witnesses, as pointed out in the statement of facts, testified that the defendant would receive a fair trial in Monroe County. Only one witness, a nephew of the defendant, testified that he could not get a fair trial; but this witness could name only one man who had expressed the opinion that the defendant could not get a fair trial. The defendant did not request that the voir dire examination of prospective jurors be taken; and the record, of course, does not disclose the number of peremptory challenges or challenges for cause that were exercised in the selection of the jury. Ordinarily this Court will not reverse a trial court on a disputed issue of fact, unless the finding is manifestly wrong or not sustained by substantial evidence. In this case however, it is not necessary to apply that rule. The evidence did not show any prejudgment of the case or grudge or ill will to the defendant in the public mind. On the contrary, it was clear that he would have a fair trial. Consequently, the court properly refused to grant the change of venue. Compare Gallego v. State, (Miss.) 77 So. 2d 321; Goldsby v. State, (Miss.), 78 So. 2d 762; Walden v. State, 129 Miss. 686, 92 So. 820; Long v. State, 133 Miss. 33, 96 So. 740; Mackie v. State, 138 Miss. 740, 103 So. 379; Dalton v. State, 141 Miss. 841, 105 So. 784; Wexler v. State, 167 Miss. 464, 142 So. 501; Shimniok v. State, 197 Miss. 179, 19 So. 2d 760; Bone v. State, 207 Miss. 20, 41 So. 2d 347; Gaddis v. State, 207 Miss. 508, 42 So. 2d 724; Durr v. State, 214 Miss. 658, 59 So. 2d 304; Wheeler v. State, Miss., 63 So.

2d 517, certiorari denied 346 U. S. 852, 74 S. Ct. 67, 98 L. Ed. 367.

■■ As to the second proposition, the appellant contends that the corpus delicti was not proved, and, for that reason, the confessions were improperly admitted. After conducting thorough preliminary hearings outside the presence of the jury, the court was fully warranted in sustaining their voluntariness and admissibility. The effect of the defendant's testimony on this hearing was that he did not make or sign the confessions because he had no recollection about them. Unquestionably, they were properly admitted, if the proof of the corpus delicti was sufficient.

■■ Now the corpus delicti, in a homicide case, consists of (1) the fact of death, and (2) the fact of the existence of criminal agency as the cause of death. Watts v. State, 210 Miss. 236, 49 So. 2d 240; Brooks v. State, 178 Miss. 575, 173 So. 409; Perkins v. State, 160 Miss. 720, 135 So. 357; Pitts v. State, 43 Miss. 472. ■■ "Both of these elements may be proven by circumstances." Perkins v. State, supra. See also 41 C. J. S., Homicide, Section 312, page 11.

■■ There was proof that the remains of a human being were found in the burned store. From the personal articles and effects on and about the remains, it was clear that they were the remains of Sam Addington. From the autopsy of the pathologist, it was also reasonably evident that Sam Addington met his death from a blow or blows about the head, and not from a mere fall. In other words, the evidence was sufficient to go to the jury on the fact of his death and the fact of the existence of a criminal agency as the cause. "Facts ascertained by reason of a prisoner's confession may be taken into consideration in establishing the corpus delicti." Pitts v. State, supra. ■■ Much slighter proof is required to establish the corpus delicti where the accused has confessed. Heard v. State, 59 Miss. 545. The concern is that a real, not an imaginery, crime has been confessed.

Brooks v. State, supra. ██ █ All of the circumstances together with the confessions were amply sufficient to convince the jury beyond a reasonable doubt that the defendant murdered Sam Addington. Hence the confessions were properly admitted.

██ █ In view of what has been said in answer to the appellant's contention Number 2, it is obvious that he was not entitled to a directed verdict of not guilty, and that his proposition Number 3 is untenable.

As to his contention that it was error to deny his motion for a continuance, it must be kept in mind that the crime was committed on November 16, 1954; that the defendant was arrested several days later; that he was confined in the county jail, where his family had access to him; and that court did not meet until March 14, 1955. It should have been evident to him and his family, and they should have "anticipated the practical certainty of an indictment" and taken steps for his defense accordingly. Goins v. State, 155 Miss. 662, 124 So. 785; Bolin v. State, 209 Miss. 866, 48 So. 2d 581. There was no request made to the court for appointment of counsel. It was said that he and his people were poor. Be that as it may, however, they did employ counsel before the arraignment. It is not unreasonable to believe that, in the exercise of due diligence, such employment could have been made sooner. The case was called for setting a week after the arraignment. Of course, the court's purpose in so doing was to give time to obtain witnesses on both sides. When the case was called, a continuance was sought not because material witnesses, who had been subpoenaed, had not been found; but that, because of an insufficient investigation, the witnesses had not been subpoenaed. The case was set for trial on March 26, and at that time, the supplemental motion for a continuance was not based on the absence of material witnesses. It was dictated into the record and was based on flood conditions which were said to have interfered with the investigation, and on account of the absence of a member

of the firm of attorneys, who was a member of the National Guard. It was not a sworn motion in accordance with the statute, nor was any evidence introduced to substantiate the allegations. When court resumed on March 28 to hear the evidence on the merits, no further motion for a⁄continuance was made.

"All indictments shall be tried at the first term, unless good cause be shown for a continuance". Section 2518, Code of 1942. The necessary time for the accused and his counsel to prepare his trial must necessarily be left largely to the sound discretion of the trial judge, bearing in mind the facts and circumstances of the particular case. 22 C. J. S., Criminal Law, Section 478b, page 734. See also Newell v. State, 209 Miss. 653, 48 So. 2d 332; Freeman v. State, 29 So. 75; Jones v. State, 60 Miss. 117; Coward v. State, 158 Miss. 705, 131 So. 254. Compare also Robinson v. State, 77 So. 2d 265, and Gallego v. State, supra.

Viewing the completed trial in its entirety, as reflected by the record, together with the several defenses so ably presented by defense counsel, we are unable to find any abuse of discretion by the learned trial judge in denying the motion for a continuance, or that the defendant was the victim of any injustice. Section 1520, Code of 1942.

The evidence fully justified the jury in believing beyond a reasonable doubt that the defendant, with robbery as the motive, murdered Sam Addington at the time and place in question, and burned the building for the purpose of concealing his crime. Two separate juries passed on his sanity, both present and at the time of the killing, and both of them found that he was sane, according to law, in each instance. The evidence fully sustained those verdicts. The court gave him fair and liberal instructions on the law of the case. We are unable to find any prejudicial error in the record. Consequently, for his horrible crime of murder, the defendant must suffer the extreme penalty of law. The judgment of the lower court

is therefore affirmed and Friday, December 9, 1955, is set for the date of execution, as provided by law.

Affirmed and Friday, December 9, 1955, fixed as date of execution.

All Justices concur, except *McGehee, C.J.*, who, being ill, took no part.