# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00501-COA

**HENRY BENAMON A/K/A HENRY JORDARELL BENAMON**                                   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                   **APPELLEE**

DATE OF JUDGMENT:                  03/28/2024
TRIAL JUDGE:                       HON. MICHELLE DEAN EASTERLING
COURT FROM WHICH APPEALED:         NOXUBEE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:            OFFICE OF STATE PUBLIC DEFENDER
                                   BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:             OFFICE OF THE ATTORNEY GENERAL
                                   BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:                 SCOTT WINSTON COLOM
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                       AFFIRMED - 04/21/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Henry Benamon was convicted of first-degree murder and possession of a firearm by a felon. On appeal, Benamon argues that the trial court erred by (1) denying his motion to quash the venire after he briefly appeared in the courtroom prior to voir dire in handcuffs and shackles and (2) refusing to give a jury instruction on the lesser-included offense of heat-of-passion manslaughter. Finding no error, we affirm.

## FACTS AND PROCEDURE

¶2.     Benamon and Lisa Brooks worked together at Peco Foods and were also involved in a romantic relationship. In April 2021, Benamon moved into Brooks's home in Macon,

Mississippi. Neither Benamon nor Brooks owned a car, so their coworker Michael Barber typically drove them to and from work.

¶3. On July 15, 2021, Benamon and Brooks argued at work and had to be separated. As Barber drove them home after work, Brooks repeatedly told Benamon that he had "to get out [her] house." Barber dropped off Benamon and Brooks at Brooks's house and left.

¶4. Around 10 p.m. that evening, Benamon called Barber and asked for a ride. Benamon said that Brooks had "left her phone" and "gone with somebody," but he did not "know where she went." Barber told Benamon that he was "not coming" and that he would see Benamon and Brooks when he picked them up in the morning for work.

¶5. Benamon also called his cousin Jamikah and asked for a ride. Benamon told Jamikah that he had "just shot somebody." Jamikah told Benamon she was "sure not coming if [he] just shot somebody" because she "want[ed] to have nothing to do with that." Benamon "kind of got frustrated" with Jamikah and "got off the phone."

¶6. Benamon next called Jimmy Cole and asked for a ride. He told Cole that Brooks had "put him out." When Cole arrived at Brooks's house, Benamon got into Cole's car and told Cole to turn off his headlights. Benamon was carrying three or four bags and two cellphones and asked Cole to drive him to Meridian.

¶7. Around 3:30 a.m., Barber received a text message from Brooks's phone stating that she and Benamon were "at the casino" and would be late for work. The next text message asked Barber to tell their supervisors that they "had to rush to [the] hospital for [Benamon's] face." Barber tried to call Brooks in the morning around 9 a.m. and again around noon, but

2

Brooks did not answer. Around 1:30 p.m., Barber received another text message from Brooks's phone stating that she and Benamon were going "out of town." Barber was suspicious and tried to call Brooks again, but Brooks still did not answer.

¶8. On July 17, Brooks's son, Darnell Welch, was concerned because he had not heard from Brooks, and she and Benamon were not answering their phones. Welch talked to Barber, who confirmed that Brooks had missed work.

¶9. Later that evening, Welch went to Brooks's house to check on her, but no one came to the door. All the doors were locked, so Welch broke a window and entered the home. He found Brooks's body wrapped in a comforter on the floor of her bedroom. Prior to Welch's arrival, there was no sign of forced entry at the home.

¶10. Welch again tried to call Benamon, but Benamon did not answer. Welch then called Brooks's brother-in-law, Andreas Walker, a member of the Macon Police Department (MPD). Walker went to Brooks's house and confirmed that she was dead. The MPD and the Mississippi Bureau of Investigation (MBI) investigated the case. Investigators found a projectile and a cartridge casing on the floor of Brooks's bedroom. They found nothing else out of the ordinary and no other signs of an intruder or altercation in the home.

¶11. After discovering that Brooks's cell phone was missing, MBI subpoenaed Brooks's and Benamon's cell phone records. MBI determined that both phones traveled from Macon to Meridian on July 16 but then stopped transmitting signals.

¶12. MBI also subpoenaed Benamon's Facebook records. From July 15 to 17, Benamon sent Facebook messages to other users asking for help to leave town. He also stated that he

had "f***ed up . . . bad."[1]

¶13.    On July 29, the United States Marshals Service apprehended Benamon in Pine Apple, Alabama, and returned him to Mississippi. A Noxubee County grand jury indicted Benamon for first-degree murder and possession of a firearm by a felon.

¶14.    At trial, Barber testified that he had seen Benamon previously carrying a revolver. Welch testified that Benamon carried a revolver and that his mother did not own a gun.

¶15.    Dr. Mark LeVaughn, the State's chief medical examiner, testified that Brooks sustained three gunshot wounds, including one to the back of the head that was fired from "three or four feet." Dr. LeVaughn determined that Brooks's cause of death was homicide.

¶16.    Philip Bridges, a forensic scientist with the Mississippi Forensics Laboratory, testified that the projectile found in Brooks's bedroom and a projectile recovered from Brooks's body during her autopsy both had class characteristics consistent with a .38-caliber revolver.

¶17.    After the State rested its case-in-chief, Benamon testified. He claimed that two days before Brooks's death, she "put a gun to [his] head" because he was talking to another woman. He admitted that he argued with Brooks on July 15 and that he was "jealous," but he said he was not "jealous to the point of where [he] would kill her or put [his] hand on her." He testified that when he and Brooks left work with Barber on July 15, he "begged" Barber to take him to his grandmother's house "because [he] felt like something was going to happen that night." However, Barber drove him and Brooks to Brooks's house.

---

[1] On July 16, before Brooks's body was even discovered, Benamon also sent messages to various women on Facebook, complimenting their appearances, asking if they were "single," and asking for their phone numbers.

¶18. Benamon testified that he and Brooks argued again that night but later "made up." Benamon took a shower, and he and Brooks were in her bedroom. Benamon testified that he thought they were "fixing to have sex." But just then, a "masked man" opened the door and appeared to be "reaching" for a gun. Benamon did not recognize the masked man. Benamon "rushed" the masked man, and they "got to tussling." To Benamon's surprise, Brooks then "grabbed [Benamon] too" as if "she was helping [the masked man]." As they continued tussling, Benamon, the masked man, and Brooks "all fell on the bed." Benamon testified that he "turned over" and saw Brooks "with a gun." Benamon testified that as he continued to fight the masked man, he "snatch[ed]" the gun from Brooks, "the gun went off," and Brooks "fell over the bed." When Benamon went to "check on" Brooks, the masked man fled. Benamon realized that Brooks was dead. He testified that he did not feel safe in Noxubee County because Brooks's brother-in-law (Walker) was a police officer, so he left town immediately. Benamon said that he "threw [the gun] out" later and did not know where it was. Benamon denied that he ever possessed a .38-caliber revolver prior to July 15.

¶19. Benamon testified that he could not say whether he shot Brooks. He testified, "I'm not going to say I shot. I'm not going to say I didn't shoot. Because if we tussling, I can't say that I shot . . . or he [(i.e., the masked man)] shot."

¶20. The jury convicted Benamon of first-degree murder and possession of a firearm by a felon, and the trial court sentenced him to concurrent terms of life imprisonment and ten years in the custody of the Department of Corrections. Benamon filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

5

¶21. On appeal, Benamon argues that the trial court erred by (1) denying his motion to quash the venire after he briefly appeared in the courtroom prior to voir dire in handcuffs and shackles and (2) refusing to give a jury instruction on the lesser-included offense of heat-of-passion manslaughter.

ANALYSIS

### I. Motion to Quash the Venire

¶22. Prior to voir dire, in the presence of the jury venire, Benamon was brought into the courtroom in handcuffs and shackles and seated at the defense table. Benamon was wearing street clothes, not jail attire. Once Benamon was seated, the handcuffs and shackles were no longer visible to the venire. The district attorney immediately noticed the handcuffs and shackles, but the judge was not in the courtroom. Rather than ask the sheriff's department to remove Benamon from the courtroom or remove the handcuffs and shackles in the jury's presence, the district attorney asked the bailiffs to remove the venire from the courtroom. Benamon's handcuffs and shackles were then removed outside the jury's presence. The district attorney estimated that Benamon was in the jury's view in handcuffs and shackles for no more than "thirty seconds," which defense counsel did not dispute. In addition, the podium and other features of the courtroom at least partially obscured the venire's view of the shackles and handcuffs. It was not clear how many, if any, potential jurors actually observed the handcuffs or shackles.

¶23. Benamon moved to quash the venire, arguing that the incident had tainted the jury and that he could not receive a fair trial. The State responded that under applicable precedents,

6

the trial court was not required to quash the venire based on Benamon's brief appearance in the courtroom in handcuffs and shackles. After a brief recess, the trial judge stated that she had reviewed relevant caselaw, including *Payton v. State*, 897 So. 2d 921, 931-33 (¶¶6-18) (Miss. 2003), and other cases, and found that Benamon had not sustained any substantial or irreparable prejudice and could receive a fair trial. The judge also noted that Benamon could voir dire the jury panel as to what they observed and whether it would affect them. Therefore, the judge denied Benamon's motion.

¶24. It is well-settled that "[r]estraints should be used [in the courtroom] only in exceptional cases where there is evident danger of escape or in order to protect others from an attack by the prisoner." *Id.* at 931 (¶12). "Permitting the jury to see the defendant bound and shackled improperly encroaches on the defendant's presumption of innocence." *Id.* at 931-32 (¶12). A violation of this right may require the court to quash the venire. *Id.* at (¶¶11-12). "However, the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal." *Id.* at 932 (¶12).

¶25. The decision whether to quash a venire is "entrusted to the sound discretion of the trial court" and will not be reversed unless that discretion is abused. *Id.* at 931 (¶11). "Where the evidence is conflicting on the question of whether or not the defendant could receive a fair and impartial trial, this Court will generally defer to the considered opinion of the trial judge." *Id.* (ellipsis omitted).

¶26. In *Payton*, the defendant argued that he was denied a fair trial because he was brought

7

into the courtroom in the presence of the venire in shackles and chains. *Id.* at (¶6). The trial judge had the restraints removed and noted that the venire's "view" of the defendant "would have been obstructed by the rail, the lectern, the counsel table, and by the attorneys seated at the table." *Id.* at (¶8). The court also granted additional time for defense counsel to question the venire regarding the incident, but defense counsel did not ask any questions on the subject. *Id.* at (¶10). The Supreme Court emphasized that "without a showing of prejudice," the Court had "generally been unwilling to reverse a conviction on these grounds." *Id.* at 932 (¶16). The Court found that the error in *Payton* was a "non-prejudicial technical violation" because the defendant "was restrained in the venire's presence for only a short time," and "his restraints were removed, outside the presence of the jury, as soon as being brought to the court's attention." *Id.* at (¶17). Moreover, the defendant "presented no evidence [to] indicate[] that the jurors were not fair and impartial." *Id.* For these reasons, the Supreme Court affirmed the trial court's denial of the defendant's motion to quash the venire, finding that the defendant failed to show that he was prejudiced and failed to rebut the "presumption that the judgment of the trial court [was] correct." *Id.* at 933 (¶18).

¶27. Similarly, in *Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974), the defendant argued that he was denied a fair trial when a deputy brought him into the courtroom in handcuffs in the presence of the venire. The handcuffs were immediately removed at defense counsel's request. *Id.* Finding no prejudice to the defendant, the Supreme Court held that "the failure, through an oversight, to remove handcuffs from a [defendant] for a short time" was not grounds for reversing his conviction. *Id.*

8

¶28. The facts of this case are substantially similar to *Payton* and *Rush*. Benamon was only briefly shackled in the jury's presence, the shackles were removed outside the jury's presence as soon as the district attorney noticed them, and Benamon presented no evidence that he was prejudiced or denied a fair trial as a result. Accordingly, the trial court did not abuse its discretion by denying Benamon's motion to quash the venire.

## II. Manslaughter Instruction

¶29. Benamon also argues that the trial court erred by refusing a jury instruction on heat-of-passion manslaughter. The trial court refused the instruction, finding that there was no basis in the evidence to support the instruction and that "[t]his is not a heat of passion case." On appeal, Benamon argues that his own "testimony unequivocally supported the granting of a [heat-of-passion] manslaughter instruction" because he testified that he "fought" "with a masked intruder in his bedroom."

¶30. We review de novo the refusal of a lesser-included-offense instruction. *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007). A defendant is entitled to a lesser-included-offense instruction if there is some evidence from which a reasonable juror could find him both not guilty of the indicted offense and guilty of the lesser-included offense. *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013). However, "the jury should not be presented with a lesser-included-offense instruction unless the record provides an evidentiary basis for the instruction." *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (quotation marks omitted). Therefore, "lesser-included-offense instructions should not be granted on mere speculation." *Id.*; *Wallace v. State*, 369 So. 3d 83, 88 (¶15) (Miss. Ct. App. 2023).

¶31.    A killing is manslaughter if it is committed "without malice, *in the heat of passion*, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35 (Rev. 2020) (emphasis added). Importantly, "[h]eat-of-passion manslaughter is an *intentional homicide* that is reduced from murder to manslaughter because it was committed in the heat of a sudden passion caused by some sufficient provocation or injury." *Brown v. State*, 336 So. 3d 134, 144 (¶28) (Miss. Ct. App. 2020) (emphasis added), *cert. denied*, 316 So. 3d 202 (Miss. 2021); *see also Cap. City Ins. v. Hurst*, 632 F.3d 898, 903 (5th Cir. 2011) ("Under Mississippi law, heat-of-passion manslaughter is a lesser-included offense of murder because it lacks malice, not willfulness.").

¶32.    The Mississippi Supreme Court has defined "heat of passion" as follows:

> A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from a grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). In addition, the Court has stated:

> One of the primary elements of a heat-of-passion crime is immediate and reasonable provocation, by words or acts of one at the time. . . . [I]t is essential that the excited and angry condition of the party committing the act which would entitle him to the milder consideration of the law, should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation. . . . [T]here must not only be passion and anger to reduce a crime to manslaughter, but there must be such circumstances as would indicate that a normal mind would be roused to the extent that the

10

reason is overthrown and that passion usurps the mind destroying judgment.

*Id.* at 866-67 (¶36) (citation and quotation marks omitted). "The mere fact that [the defendant] and [the victim] were arguing before the [killing] is insufficient to reduce the crime to manslaughter." *Avera v. State*, 761 So. 2d 900, 903 (¶10) (Miss. Ct. App. 2000). "Words of reproach, criticism or anger do not constitute sufficient provocation to reduce an intentional and unjustifiable homicide from murder to manslaughter." *Gaddis v. State*, 207 Miss. 508, 515-16, 42 So. 2d 724, 726 (1949). "When a deadly weapon is used, as here, malice is implied. In order to overcome that implication, there must be some evidence in the record from which the jury could determine that the act was not the result of malice, but a result of heat of passion." *Frazier v. State*, 382 So. 3d 1193, 1202 (¶25) (Miss. Ct. App. 2024) (citation and quotation marks omitted).

¶33.    In the present case, the trial court did not err by refusing Benamon's request for a heat-of-passion manslaughter instruction. The court correctly found that there was no basis in the evidence for the instruction because there was no evidence that Benamon acted in a "heat of passion." Indeed, Benamon himself claimed that he did not even know who shot Brooks, i.e., whether he or the alleged "masked man" fired the fatal shot. Benamon testified that the gun just "went off" as he wrestled it from Brooks while also struggling with the masked man. As stated above, "[h]eat-of-passion manslaughter is an *intentional homicide* that is reduced from murder to manslaughter because it was committed in the heat of a sudden passion." *Brown*, 336 So. 3d at 144 (¶28) (emphasis added). But in this case, Benamon claimed that he may or may not have killed Brooks by accident during a struggle.

During the jury instruction conference, defense counsel stated that "the defense [Benamon] presented" at trial was that "he was fighting for his life," and either he or the masked man "accidentally" shot Brooks. The trial court confirmed with defense counsel that Benamon's defense was "accident or misfortune," and, as Benamon requested, the court instructed the jury on the excuse of accident. *See* Miss. Code Ann. § 97-3-17 (Rev. 2020). Thus, the jury was properly instructed on the defense's theory of the case. The trial court did not err by refusing to instruct the jury on a species of manslaughter that had no basis in the evidence.

## CONCLUSION

¶34. The trial court did not abuse its discretion by denying Benamon's motion to quash the venire, nor did it err by refusing a heat-of-passion manslaughter instruction. Therefore, we affirm Benamon's conviction and sentence.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**